LANNING *v.* CARPENTER.

It is not necessary that the statement to authorize the entry of judgment by confession under section 383 of the Code should in terms state that the sum confessed is justly due or to become due.

The particular facts must be set forth in such manner as to show a just debt and the amount thereof, but where the creation of a just debt is averred it is unnecessary in terms to negative that it has been paid or otherwise discharged.

*So held,* where the statement averred an indebtedness, and its amount, on promissory notes given for borrowed money and also for the plaintiff's having assumed the payment of another promissory note made by the defendant, whereby the note had been paid and taken up, with a sufficient description of the several notes.

The judicial, senate and assembly districts organized by or in pursuance of the Constitution, continue unchangeable until a fresh arrangement, made after the return of the next or some succeeding decennial census.

The Constitution requires that each judicial and (except in New York city) senate district shall at all times be composed of entire counties, and no county can be so organized as to include fractions of two or more judicial, senate or assembly districts.

The Legislature cannot form any part of the existing territory of the State into a county, except at a time when it has the power to provide for its taking its place as an entirety in the political and judicial divisions of the State without the aid of any further enactment by a future Legislature.

Where the full organization of a new county would derange the limits of judicial or senatorial districts, the constitutional difficulty is not obviated by a suspension of the operation of the act in respect to judicial proceedings and to elections, until after the return of the next census.

The bill (*ch.* 386 *of* 1854) to organize the county of Schuyler, adjudged unconstitutional.

APPEAL from the Supreme Court. Motion by subsequent judgment creditors to set aside a judgment confessed by the defendant to the plaintiff and executions which had been issued thereon to the sheriffs of Schuyler and Steuben counties. On the 14th day of July, 1855, the defendant signed and verified this statement:

SUPREME COURT.

Daniel Lanning
*v.*
John Carpenter.

I do hereby confess judgment in this cause in favor of Daniel Lanning for the sum of one thousand four hundred and fifty dollars, and authorize judgment to be entered therefor against me. This confession of judgment is for indebtedness from me to the said Lanning, arising out of the following facts, viz.: On one promissory note given by me to the said Lanning on the 8th day of December, 1854, for one hundred dollars borrowed money on which is indorsed eleven dollars and sixty cents, said note due when given. Also, one promissory note of three hundred and forty dollars made by me and dated Oct. 17th, 1854, due when given, and now owned by said Lanning, the same being given for borrowed money. Also, for the said Lanning assuming the payment of the sum of one thousand dollars at The Bank of Havana on the 14th day of July, 1855, by which a note of one thousand dollars, made by me payable to the order of Samuel Carpenter at the said Havana Bank, dated on the 31st day of May, 1855, and indorsed by the said Samuel Carpenter and D. J. Sunderlin was paid and taken up. Dated July 14th, 1855.

The statement was on the same date filed with the person claiming to act as the clerk of Schuyler county, at Havana, and what purports to be a judgment of the Supreme Court was perfected thereon.

The motion to set aside the judgment was upon the grounds: 1. That the statement was insufficient to authorize its entry anywhere. 2. That the act of April 17th, 1854, erecting the county of Schuyler was unconstitutional and void for all purposes, and if not that it did not create a new county in reference

Lanning *v.* Carpenter.

to the jurisdiction and officers of the Supreme Court or any proceedings therein, and therefore the judgment was invalid.

The statement was alleged to be insufficient because it was not stated that the first note was given for $100 loaned by the plaintiff to the defendant, or that the defendant borrowed that or any other sum from the plaintiff, or when, or what amount of money if any was advanced by the plaintiff to the defendant as the consideration for this note; nor is it stated but that all the money borrowed had been repaid; it is not said that the amount of the note or any amount upon it was justly owing. As to the $1,000 it was argued that there is nothing stated showing the amount to be justly owing by the defendant except the fact that he was the maker of a note.   It is not said that the note was ever discounted by the bank, or that it was made or used for the defendant's benefit, or that he received anything upon or for it, or that any amount was justly owing by the defendant on account of that note: the facts out of which the indebtedness arose are not stated.

The motion was ordered to be heard at general term in the seventh district, where it was held that the act to organize Schuyler county had not by its terms taken effect in respect to the jurisdiction and officers of the Supreme Court, at the time of the entry of the judgment; and the judgment and subsequent proceedings were set aside.   The plaintiff appealed to this court.   The argument was in April, 1859, but the case was held under advisement until this term.

*Nicholas Hill,* for the appellant.

*Francis Kernan,* for the respondent.

Denio, J.   A majority of the judges have come to the conclusion that it will be impossible to decide this appeal without determining the question of the constitutional validity of the act to erect the county of Schuyler, passed in the year 1854. The legal existence of the county in and after the year 1857, has been affirmed in this court (19 *N. Y.*, 41); but according to

the opinions of at least two of the five judges whose concur-
rence was necessary to pronounce that judgment, the act as
originally passed could not be sustained consistently with
constitutional provisions; and the validity of the county
organization was considered by those judges as established
only by the effect of the legislation of the last mentioned
year.

In the present case the judgment which the appellants seek
to sustain was confessed in July, 1855. The forms required
by law for entering, recording and docketing it required the
agency of a county clerk, acting in regard to that subject as
a clerk of the Supreme Court, and of a clerk's office; and, it
being assumed by the parties concerned in this judgment that
there was then a legally constituted county of Schuyler with
the usual county officers, the action of these officers was in-
voked and exercised in confessing and entering the judgment.
If the act by which it was attempted to create the county was
void, as the appellant claims, the place in which the busi-
ness was transacted was a part of one of the counties out of
which the new county was attempted to be made, and the per-
son who assumed to act as clerk had no authority or jurisdic-
tion in the matter, and consequently the pretended judgment
was a legal nullity.

By the present Constitution, adopted in the year 1846, it was
declared that an enumeration of the inhabitants of the State
should be taken in the year 1855, and at the end of every
ten years thereafter. (*Art.* 3, § 4.) A principal object of this
proceeding was to enable the Legislature to adjust from time
to time the representation in the Legislature upon the basis of
population, and to arrange in a convenient manner the judicial
districts into which the State was to be divided. The thirty-
two senate districts were in the first instance defined by the
Constitution itself, each district consisting of one or more
counties, except as to the city and county of New York, which
was together to form four districts, the boundaries of which
were to be fixed by the board of supervisors of that county,
at their ensuing May meeting. It was provided that at the

first session of the Legislature after the return of every enumeration, the senate districts should be so altered by the Legislature that each district should contain, as nearly as might be, an equal number of inhabitants; and then they were to remain unaltered until the return of another enumeration; and no county was to be divided in the formation of a senate district unless it should be entitled to at least two Senators. The members of the Assembly were to be apportioned by the Legislature among the counties according to their respective population as near as might be; but the apportionment made under existing laws was to be the rule for the present; and the boards of supervisors of the several counties which were entitled to more than one Assemblyman by the existing apportionment were required to meet on a certain day of January then next, and divide their county into the requisite number of assembly districts, of equal population as near as might be without dividing any town. At the first session of the Legislature after the return of each enumeration, there was to be a re-apportionment of the members of Assembly among the counties on the same basis, and the Legislature was to set a time for the boards of supervisors of these counties, which should have more than one member, to meet and form the assembly districts anew; and, the section proceeds, "the apportionment and districts so to be made shall remain unaltered until another enumeration shall be taken under the provisions of the preceding section. (§ 5.) Every county, except Hamilton, was to have at least one member of Assembly; and it was declared that no new county should be afterwards erected unless its population should entitle it to a member.

For judicial purposes the State was to be divided into eight districts, to be bounded by county lines, and to be compact and equal in population, as nearly as might be, each of which was to have four justices of the Supreme Court, except New York, which might have a greater number, and these justices were to be chosen by the electors of the respective districts. (Art. 6, §§ 4, 12.) The Legislature was authorized to re-organize the judicial districts at the first session after the return of.

every enumeration under the Constitution, "and at no other time." (§ 16.)

The new county of Schuyler was, by the act under consideration, to be formed out of parts of the existing counties of Steuben, Chemung and Tompkins. (*Laws of* 1854, *ch.* 386, § 6.) By the arrangement of senate districts contained in the Constitution, Tompkins county fell into the twenty-fifth and Steuben and Chemung constituted the twenty-sixth district. The Legislature, at its first session after the adoption of the Constitution, passed an act dividing the State into judicial districts. (*Laws of* 1847, *ch.* 241.) Chemung and Tompkins were included in the sixth, and Steuben in the seventh judicial district. Thus, it will be seen, the new county was to embrace parts of two senate districts, and of two judicial districts.

The senate districts, being established by the Constitution, could only be changed in pursuance of its provisions; and the only authority to make any change in them is that found in the provision allowing them to be so altered at the first session after the return of every enumeration, so that each district shall have an equal number of inhabitants, as near as may be. So with the judicial districts, the Legislature were to form them, by dividing the State into eight portions, of contiguous counties, and then leave was given to re-organize them at the first session after the return of every enumeration, and at no other time.

From this statement, nothing can be clearer than that. the senate districts were to remain as the Constitution had established them, and that the judicial districts, after being once defined by the Legislature, were to continue without change until after the first enumeration, in 1855. It seems to me equally clear that the apportionment of members of the Assembly, according to the existing laws, was likewise to continue until after the next enumeration. The language, it is true, is not quite so precise as that respecting senate and judicial districts. The authority is conferred in general terms, at the commencement of section 5 (*art.* 3), upon the Legislature to apportion the members of the Assembly among the several

Lanning *v.* Carpenter.

counties; and if there was nothing to qualify this power, the Legislature would be the judges as to the time of performing the duty. But the next sentence provides for the meeting of the boards of supervisors at a day named, in January, 1847, to divide the counties into assembly districts, and those districts are to correspond with the number of assemblymen to which the respective counties were then entitled by the existing laws. Then follows the provision for a re-apportionment at the first session after each census, and for sessions of the boards of supervisors after such apportionment to change the assembly districts so as to conform them to the new apportionment. My conclusion upon this part of the case is strengthened by the consideration that the last decennial enumeration under the Constitution of 1822 was taken in 1845. That instrument, like the present Constitution, required an enumeration every ten years, commencing in 1825; and a new apportionment of members of the Assembly was to be made by the Legislature at the first session after each enumeration. The last constitutional convention sat in 1846, when the enumeration of 1845 had just been returned to the Legislature, and that body had, at its then last session, passed a statute for re-apportioning the members of the Assembly according to that return. (*Laws of* 1846, *ch.* 44.) The design of the convention of 1846 plainly was to continue the system of decennial enumerations and apportionments, by fixing the then next apportionment at the time of the coming in of the return of the census of 1855.

If we bear in mind that it is established by the Constitution that no county shall be divided in the formation of a senate district, and that the judicial districts are always to be bounded by county lines, that is, to consist of whole counties, and never of fractional parts of counties, we shall have a view of all the constitutional provisions bearing directly upon the case.

The act to erect Schuyler county was passed the last year of the decennial term. Regularly, the census would be taken in the course of the ensuing year, and the return would be made to the Legislature at the session commencing on the 1st Monday of January, 1856. (*Laws of* 1845, *ch.* 140.) Until that ses-

sion should be held, there was no power in the Legislature to make any change in the assembly, senate or judicial districts. The act in question does not assume to make any such change, but it does anticipate that at the proper time there would certainly be a re-arrangement of all those districts. It therefore provides in substance, that notwithstanding the erection of the new county, any election to be held for the choice of members of the Legislature, or justices of the Supreme Court, should be conducted according to the existing arrangement of districts, and that the jurisdiction of the Supreme and Circuit Courts, and the Courts of Oyer and Terminer, should continue according to the provisions of existing laws, "until after the next State census or enumeration." (§ 6.) Schuyler county was immediately to be a separate and distinct county of the State for all other purposes, and after the next State census for all purposes whatever. The direct consequence of this legislation would be, that until the anticipated re-organization of the judicial districts, neither the sixth nor the seventh of these districts would be bounded by county lines, as each one of them would embrace a portion of Schuyler county. That county would likewise be divided in the formation of the twenty-fifth and twenty-sixth senate districts, a part of its territory belonging to each. It was no doubt supposed that the conflict with constitutional provisions would be temporary, and cease by the action of the Legislature at its session of 1856; and such would have been the case as to the senate districts, if the Legislature had at that time performed its duty; for the direction is positive to alter the senate districts at the first session after each enumeration. (*Art.* 3, § 4.) In respect to the judicial districts, there is no absolute mandate to re-organize them at any time. Power to do it is conferred, to be exercised only at the time prescribed; but it was to depend upon the discretion of the Legislature in existence at the session when the census returns should be brought in, to determine whether a re-organization should take place or not. (*Art.* 6, § 16.) It is obvious that the first session after the census was designated as the time for exercising that power, because the Legislature would

Lanning *v.* Carpenter.

then have before it an authentic population return, down to a time immediately prior to that fixed for its action; and it is equally obvious that no prior Legislature, it not having before it the evidence deemed essential for the discreet performance of that duty, could constitutionally be permitted to do any act to coerce the proper Legislature to act in any particular manner upon that subject, or to act upon it at all. In effect, the Legislature of 1856 did not pass any act to change either the senate or the judicial districts. As to the latter, it cannot be said that the omission was any violation of a constitutional duty, for the power, as has been remarked, was a discretionary one. In judgment of law, it must be considered as omitted, because, in the opinion of the Legislature, the public good did not require it to be done. But, by the act of 1854, the new county was, from the time of the return of the census of 1855, to be a county of the State for all purposes whatever, whether the Legislature should have acted upon the judicial districts or not. After that event, the laws as to the election of justices, and the holding and jurisdiction of the courts, became inoperative; and as the allotment of judicial districts, established by the act of 1847, remained in force by positive constitutional injunctions, it follows that the territory of one part of Schuyler county continued to be attached to the sixth, while another portion remained attached to the seventh judicial district. This was a plain violation of the constitutional injunction that the judicial districts should be bounded by county lines. It is unnecessary to adduce any argument to vindicate the wisdom of the direction in that respect, though it is easy to see that very great inconvenience would arise if the inhabitants of a county who would necessarily be associated for all purposes of civil, and for most purposes of judicial administration, were yet obliged to resort to different judicial districts for the transaction of the business conducted in the Supreme Court. Such a state of things would require a modification of many statutes; for our whole administrative system is based upon the idea that the several judicial districts are each an aggregation of

entire counties, as the counties are themselves a collection of separate towns. What the Legislature attempted to do in this instance, was to create a county, which, for a time, should not belong to any one senatorial district, or to any one judicial district. It was indeed expected that some two years afterwards a future Legislature would be willing, as they would then be able, so to re-form the districts that the anomaly would cease, and the new county would be assigned to its proper orbit. Until that period, a state of things would exist not contemplated, and, in my judgment, not per mitted by the Constitution. And when the time should arrive, it might happen, as it did in fact, that the Legislature of the day would let the anomalous county remain as they found it. It was a necessary consequence that by this legislation, if valid, there was in the State, after the adjournment of the Legislature of 1856, a fully organized county, which did not belong to any senate district, and which was altogether outside of the judicial organization, so far as concerned the Supreme Court, the Circuit. Court, and the Court of Oyer and Ter miner; and this was not the fault of the Legislature of 1856, which, as before remarked, was under no constitutional obligation to meddle with the judicial districts. Unless the Legislature of 1856 was competent, of its own inherent powers to create a county out of the territory actually comprised in the contemplated county of Schuyler, which should take its place in the judicial system of the State as organized by the Constitution, without the aid of further provision to be enacted by a future Legislature, and which such future Legislature might furnish or withhold at its discretion, it could not con stitute such a county at all.

It has been said, that where there are apparently conflicting provisions in the Constitution, they are to be harmonized by con struction if reasonably practicable. It is then assumed that the Constitution confers upon the Legislature a general power at all times to create new counties out of any of the existing counties, and it is admitted that the judicial districts must always be com posed of entire counties, and that the original organizat'on of

these districts pursuant to the Constitution, could not be changed until he legislative session of 1856. The argument considers these several provisions to be in some sense hostile to each other; and the mode of reconciliation suggested is, that a county may be created out of territory lying in several districts, and exist in that condition temporarily till the next census, in the expectation that it will then be arranged as an entirety in one district, and that a provision may be made to prevent public inconvenience in the meantime, by which the separate parts of the new county shall remain attached for judicial purposes to the districts to which it belonged before the new county was created. This, though confessedly a violation of the provision that the judicial districts shall be composed of entire counties, should, it is argued, be permitted, to prevent an irreconcilable hostility between the two provisions. I do not deny the principle of construction referred to, but in my opinion there is no such incongruity in the Constitution as the argument supposes. There is no power expressly conferred upon the Legislature to create new counties. It is a part of the general law-making power inherent in the Legislature, but like all other powers it is limited by the other particular arrangements of the Constitution. It is parcel of these arrangements, that the several judicial districts shall always be composed of whole counties and never of parts of counties. True, the Legislature has power to create new counties out of the old ones. Whenever this can be accomplished without deranging the limits of districts, it may perhaps be done at any time; and when it is deemed advisable to constitute a new county out of parts of several districts, it may be done at a time when the Legislature is empowered by the Constitution to reorganize the districts, but at no other time. Thus, no provision or arrangement of the Constitution is violated or disturbed. The power which the Legislature would possess in the absence of these special arrangements, is in one particular somewhat modified, but that is necessarily the case in respect to all the special directions contained in the Constitution.

I am of opinion that the act of 1854 was not, when it was

enacted, a constitutional exercise of legislative power, and that the county attempted to be created did not legally exist in 1855, when the judgment which the Supreme Court set aside was docketed; and I am in favor of affirming the order appealed from.

JOHNSON, Ch. J., SELDEN, ALLEN and GRAY, Js., concurred. JOHNSON, Ch. J., and DENIO J., concurred in so much of the following opinion as relates to the sufficiency of the statement to sustain a judgment:

COMSTOCK, J.   The motion to set aside the judgment and execution in this case was made, firstly, on the ground that the statement or confession of the defendant did not comply with the statute. (*Code of Procedure,* § 383.)   Statements of this nature, if the debt be for money due or to become due, must set forth "the facts out of which it arose, and must show that the sum confessed is justly due or to become due."   In the confession on which the judgment in question was entered, the facts set forth are two promissory notes given by the debtor to the creditor, the amount, date, time of payment, and the consideration, which was money borrowed, being particularly stated.   There is then a further acknowledgment of the sum of $1,000, being the amount of a certain note made by the debtor and held by The Havana Bank, which on the day of the confession the creditor assumed and paid for the debtor.   It is not and cannot well be pretended that the statement, in respect to the facts out of which the indebtedness arose, does not come fully up to the requirement of the statute; the only defect alleged being that it does not "show that the sum confessed is justly due or to become due."

We think the statute does not require that the confession must state in terms that the sum for which the judgment is authorized to be entered is justly due, &c.   The obvious import of the language is that the sum due must appear from the statement.   The particular facts must be set forth in such a manner as to show not only a just debt but the amount thereof.   That being done, an additional averment, in general terms, of the

justice of the debt and its amount is not required. It is true, that although the facts stated may show with all the requisite certainty and detail the creation of a ·debt, yet it may have been paid. So also it may have been released or discharged by bankruptcy, insolvency or in some other manner. But it is not required to negative all the conceivable possibilities of the case. We have been·referred to the decision of this court, in *Chappel* v. *Chappel* (2 *Kern.*, 215). In that case the confession set forth a promissory note as the foundation of the judgment, but without disclosing the consideration on which it had been given. For that defect the Supreme Court had set aside the judgment on the application of a junior creditor, and this court affirmed the decision, although the statement in terms set forth that a certain sum, being the amount of the note and interest, was justly due. This decision sustains rather than impeaches the judgment now in question. In construing the language and giving effect to the policy of the statute, the statement of facts on which the alleged debt is founded was regarded by the court as the fundamental requisite, very little importance being attached to a general averment that a· given sum is due. On the whole, we think the judgment was entered upon a sufficient statement.

It is in the next place insisted that the judgment is void on the ground that it could not be entered and docketed in the new county of Schuyler. The act of the Legislature erecting that county (*Laws of* 1854, *ch.* 386), declares in the 6th section, that certain territory therein described ".shall from and after the passage of the act, be for all purposes, except for the election of member of the Legislature and justice of the Supreme Court, and for the holding and jurisdiction of the Supreme and Circuit Courts and Courts of Oyer and Terminer, until after the next State census and enumeration, and thereafter for all purposes whatever, a separate and distinct county," &c. Sections nine, ten and eleven provide for transcribing the records of the counties of Chemung, Steuben. and Tompkins (from parts of which the new county was· erected) so far as the same concerned. the real estate in Schuyler county, including

the dockets of judgments; and the copies so taken were to be deposited with the clerk of that county. In section 12 it was provided that all elective county officers, including, of course, a sheriff and clerk, should be chosen at the next general election. The concluding section 26, declares that " for all judicial purposes, so far as relates to the Surrogates' Courts and County Courts and Courts of General Sessions, and the jurisdiction and duties of county judge and surrogate, justices of the Sessions, *county clerks, sheriffs* and coroners, and the service and enforcement of judicial process, this act shall not take effect until the 1st day of January, 1855, but for all other purposes except as hereinbefore excepted [referring to the exceptions in section 6 as above set forth] this act shall take effect immediately." ·

It is quite clear, that the Legislature intended that the territory in question, should have amongst its local officers, to be chosen at the general election, in November, 1854, a sheriff and county clerk, who were to enter upon their duties on the 1st day of January, 1855. It is also clear that the latter was to have an office, in which he was to keep a docket of judgments, as kept by clerks of other counties. Nor is there the slightest reason to doubt, that judgments rendered by the Supreme Court, sitting in other counties, could be transcribed and docketed in his office, so as to become liens on real estate in Schuyler county, according to the general provisions of law in such cases. It is plain, also, that the sheriff of the county had the powers and could perform the duties pertaining to that office in the other counties of the State. Executions against the inhabitants of the county or their estate could be issued to him, and he could enforce them like the sheriff of any other county. " For all judicial purposes," so far as related to " county clerks and sheriffs," &c., the act was to go into full operation on the day named. The ordinary duties of clerk and sheriff, are not judicial in the proper sense, but the one in entering and docketing the judgments which the courts pronounce, and the other in enforcing writs of execution, perform acts closely connected with the judicial power of the State. The concluding section of the act, therefore, obviously meant, that from and

after the day named, those officers of the county of Schuyler possessed all the powers of that nature which belonged to such officers in other counties.

The act would be somewhat incongruous in its policy respecting judgments and executions, if the clerk could not enter and docket judgments by confession, and if the sheriff could not receive and enforce execution upon them. Such, I am persuaded, is not the meaning of the 6th section, above quoted. The territory described was not, until after the State census, to be a county for the purpose of "holding and jurisdiction" of the Supreme and Circuit Courts, and the Courts of Oyer and Terminer. Neither of those courts can be held, nor can their jurisdiction be exercised without the presence of a justice of the Supreme Court. The territory in question was taken from the sixth and seventh judicial districts of the State. If it had been annexed as a complete county for all purposes to either one of those districts, it would have been necessary at least twice a year, according to existing laws, for those courts to be held within that county. (*Code*, § 20.) But the Legislature assumed that under the Constitution, the line between judicial districts could not be changed until after the decennial census. (*Art.* 6, § 16.) Intending therefore to pass a constitutional act, they provided that the proposed territory should not, until after the census, be deemed a county for any purpose appertaining to the judicial districts, or involving a change in the existing arrangements respecting the courts to be held in the counties composing them. The new territory could not, as was supposed, be a county to all intents, without belonging wholly to one of the districts, thus requiring courts to be held within it twice in every year. The Legislature therefore provided, in the exception contained in the 6th section, that it should not be a county for the purposes therein enumerated; and it has been held by the Supreme Court, that in this way the constitutional difficulty was overcome. (*De Camp* v. *Eveland,* 19 *Barb.,* 81–90.) A similar motive, no doubt, suggested the exception in regard to the election of members of Assembly. (*Const.,* art. 3, § 5.)

Keeping in view, then, this general design and policy of the Legislature, and certainly no other can be imputed to them in thus limiting the attributes of the proposed county for a short period of time, the question before us is not attended with any difficulty. It required no Supreme or Circuit Court to be held in the county of Schuyler. Nor did it require any actual exercise of jurisdiction, or even the presence of a judge in that county, for the clerk to enter and docket a judgment upon confession. The provisions of law in respect to such proceedings (*Code*, §§ 383, 384) require a statement or confession to be made and verified by the debtor, prescribing what it shall contain. The county clerk is then authorized to file this statement in his office, and to indorse upon it a judgment for the sum confessed. The statement and verification, with the clerk's indorsement, are declared to be the judgment roll, and execution may be issued as in other cases. The authority for entering such judgment is not derived from any court, or the judge of any court. The record and docket are made by the acts of the parties and of the county clerk. The proceeding becomes a judgment, because the statute so declares. It is only by an extremely attenuated fiction that the jurisdiction of a court is invoked in such cases. But the Legislature, in limiting, as we have seen, temporarily, the purposes for which the county of Schuyler was created, had in view a real and substantial jurisdiction, and not one resting on a mere fiction, requiring no court or judge for its exercise. It is true, in fact, that no judicial power whatever is exerted when such a judgment is obtained. I am of opinion, so far as this objection is concerned, that the entry and docketing of the judgment in question, by the clerk of Schuyler county, and the issuing of execution to the sheriff, were regular and authorized proceedings.

The remaining ground of objection is, that the entire act creating Schuyler county was unconstitutional and void. This subject was examined at large, in the recent case of *Rumsey* v. *The People* (19 *N. Y.*, 41). I then thought the act was constitutional, and I have not changed my opinion.

The order appealed from ought to be reversed.

S. B. STRONG (who also delivered an opinion) and GROVER, Js., concurred.

Judgment affirmed.