[S. F. No. 4820.  In Bank.—October 25, 1907.]

# L. B. WHEELER, Respondent, v. J. W. HERBERT et al., Appellants.

INJUNCTION AGAINST EXECUTION OF VOID STATUTE—OFFICIAL ACTS.— A suit for an injunction lies in behalf of one specially interested to prevent the attempted execution of a void statute and the exercise of an office claimed to have been created thereby, but which in fact and in law is non-existent.  In such a case subdivisions 4 and 6 of section 3423 of the Civil Code, declaring that an injunction cannot be granted " to prevent the execution of a public statute by the officers of the law, for the public benefit " or " to prevent the exercise of a public or private office, in a lawful manner by the person in possession," have no application.

CHANGE OF BOUNDARIES—FRESNO AND KINGS COUNTIES—ACT OF MARCH 14, 1907—CONSTITUTIONAL LAW.—The act of March 14, 1907, providing for a change in the boundary line between the counties of Fresno and Kings, so that the territory lying south of the fourth standard parallel, south, as fixed by the United States survey, and formerly included in Fresno County, should be attached to and be a part of Kings County, in the event that at an election to be held for that purpose in the territory to be transferred to Kings County, at which all electors of the state who should have then resided in that territory for ninety days should have the privilege of voting, sixty per cent of the votes cast should be in favor of the proposed change, and further providing that the election was to be held under the direction of five special commissioners to be appointed by the governor, is, constitutional.

ID.—COUNTY BOUNDARIES MAY BE CHANGED BY SPECIAL ACT.—The amendment of 1894 to section 3 of article XI of the constitution, declaring that " the legislature, by general and uniform laws, may provide for the formation of new counties," does not prohibit the legislature, by special act, from changing the boundaries between two or more counties, leaving all of them existing as corporate entities representing political subdivisions of the state as before, with their corporate organization unchanged and undisturbed, and no prohibition against such change can be implied from the last clause of section 3, providing that if a county is " enlarged or created " from territory of another county it shall be liable for a just proportion of the debts of such county.  Such power was vested in the legislature before the amendment of 1894, and the amendment did not change the effect of the section in this respect.

ID.—ELECTION TO DETERMINE CHANGE — OFFICERS OF ELECTION.—The election authorized by the act of March 14, 1907, is merely a means provided for the determination of the event upon which the change of boundaries provided in the act is or is not to be made, and

neither it nor the matter of the creation of offices and fixing their powers and duties are subject to the provisions of subdivisions 11 and 28 of section 25 of article IV of the constitution, prohibiting special laws for conducting elections, "except on the organization of new counties, or for creating offices and fixing their powers and duties in counties, townships, election or school districts;" as the legislature has the power by special law to change the boundaries directly, and has also the power to make the change contingent upon the happening of an event, such as the result of an election, it has the power to provide the method by which the event is to be determined, and for all special agents necessary to carry out the scheme adopted, and to invest them with the necessary power for that purpose.

ID.—QUALIFICATIONS OF ELECTORS—GENERAL LAW.—The act of March 14, 1907, does not trangress section 1 of article II of the constitution by prescribing different qualifications for the electors who are to be allowed to vote at the election provided for than those prescribed in that section, nor subdivision 33 of section 25 of article IV thereof, forbidding a special law where a general law can be made applicable.

ID.—LEGISLATURE TO DETERMINE APPLICABILITY OF GENERAL LAW.—The legislature must in the first instance determine whether or not a general law can be made applicable in a particular case, and the courts will not interfere with its judgment on the subject unless it clearly and beyond reasonable doubt appears that it adjudged contrary to the fact, and the judgment of the legislature that a special law is necessary to change the boundary line between two counties is conclusive on the courts.

ID.—SPECIAL PRIVILEGES — CLASSIFICATION OF ELECTORS — UNIFORM OPERATION OF LAW ON SPECIAL CLASS.—The right or privilege granted by that act to electors who have resided for ninety days preceding the election in the territory to be transferred to Kings County which are not granted to other electors of that territory or to other electors of Fresno County, is not of the class of privileges referred to in section 21 of article I of the constitution, forbidding the grant of a privilege to any citizen or class of citizens, unless it is granted, upon equal terms, to all citizens. But if it be conceded that such privilege does fall within the scope of that section, the law does not violate its provisions, as it operates uniformly upon the class of citizens upon whom the privilege of electors is conferred, and such class is one founded upon a natural, intrinsic or constitutional distinction differentiating its members from the general body from which the class is selected.

ID.—LAW DEPENDENT ON CONTINGENCY.—The legislature has power to enact a law which shall be executed only in the event that a majority of a certain class of persons shall declare in favor of it.

ID.—SPECIAL COMMISSION TO CONDUCT ELECTION.—The commission provided for in that act does not control, supervise or interfere with

county money or property, nor perform any municipal function. It merely superintends the holding and certification of the election upon the result of which the execution of the act depends. The act, therefore, is not in conflict with section 13 of article XI of the constitution, forbidding the delegation of power to any special commission for such purposes.

ID.—TITLE AND SUBJECT OF ACT.—The act embraces but one general subject, to wit, the change of the boundary line between Kings County and Fresno County, and its title sufficiently expresses the subject.

ID.—LEGISLATIVE DISTRICTS NOT CHANGED—DECENNIAL APPORTION-MENT.—The legislative districts, in which the territory is situated which was taken from Fresno County and added to Kings County by the act of March 14, 1907, are not changed by the change in the county lines, but will remain as fixed by the General Apportionment Act of 1901 until they are again fixed by the succeeding act of 1911. The prohibition against uniting parts of different counties in forming any legislative district contained in section 6 of article IV of the constitution limits the power of the legislature in framing the general law for the decennial apportionment, but does not affect its power, included in the general grant of legislative power contained in section 1 of article IV, to alter county boundaries from time to time as it may deem best.

ID.—TIME OF ELECTION DIRECTORY.—The provision in the act requiring the commissioner to order and hold the contemplated election within sixty days after their first meeting is directory only, and as they were prevented from so doing by injunction in this case, it will be lawful for them to proceed to perform that duty within sixty days after the going down of the *remittitur* herein.

APPEAL from a judgment of the Superior Court of Fresno County.   H. Z. Austin, Judge.

The facts are stated in the opinion of the court.

Hannah & Miller, and Charles G. Lamberson, for Appellants.

A. M. Drew, J. R. Webb, Frank H. Short, and Ernest Klette, for Respondent.

SHAW, J.—The legislature, by the act of March 14, 1907, (Stats. 1907, p. 260,) provided that upon the happening of a certain contingency specified in the act the boundary line between the county of Fresno and the county of Kings should be changed. It was declared that thereupon the line of the fourth standard parallel south, as fixed by the United States survey, should be the line between the two counties, and

that the territory lying south of that line, and formerly included in Fresno County, should thereupon and thereafter be attached to and be a part of Kings County. The event upon the happening of which this change was to take place, was that at an election to be held for that purpose in the territory to be transferred to Kings County, at which all electors of the state who should have then resided in that territory for ninety days should have the privilege of voting, sixty per cent of the votes cast should be in favor of the proposed change. The election was to be held under direction of five special commissioners to be appointed by the governor.

The governor appointed the defendants as commissioners to call and hold the election and certify the result. They were proceeding, under the act, to divide the territory into election precincts and to call the election when the present action was begun to restrain them from so doing. The plaintiff is a resident, citizen, and taxpayer in the territory in question. He alleges that he will be injured in his property rights if the act is carried out, by being subjected to increased taxes and by being harassed and annoyed by conflicting claims of the public officers of the respective counties, each claiming authority to assess his property and to subject him to jury duty and other civic duties, and that the law is unconstitutional and void. The defendants demurred to the complaint on the ground that the facts stated did not constitute a cause of action. The demurrer was overruled, the defendants refused to answer, and thereupon judgment was entered enjoining defendants from further proceeding under the act. The defendants appeal from the judgment. In support of the appeal the appellants contend in the first place that a suit for injunction will not lie to prevent the execution of a void statute, and secondly, that the act is valid. The respondent claims that it is contrary to a number of the provisions of the state constitution.

1. The contention that injunction is not the proper remedy is founded on the provisions of subdivisions 4 and 6 of section 3423 of the Civil Code, which declare that an injunction cannot be granted: "4. To prevent the execution of a public statute, by the officers of the law for the public benefit. . . . 6. To prevent the exercise of a public or private office, in a lawful manner by the person in possession." The proposition

begs the question. It necessarily assumes that the statute has validity and creates public offices, the incumbents of which are authorized to perform the acts complained of. The suit, on the contrary, rests entirely upon the theory that the statute is utterly void, has no force or legal existence, and consequently, that it creates no offices and that there is no lawful action by them. If the plaintiff's theory is correct, there is no public statute to be executed and no public or private office to be exercised, and only a colorable but baseless claim to that effect. If he is entitled to prevail at all, therefore, the above provisions have no application to his case. They refer solely to injunctions against the execution of valid statutes and the exercise of offices having a legal existence. A suit for injunction in behalf of one specially interested, to prevent the attempted execution of a void statute and the exercise of an office claimed to have been created thereby, but in fact and in law non-existent, is a proper remedy to obtain the relief required. (*Livermore* v. *Waite*, 102 Cal. 113, [36 Pac. 424]; *Conner* v. *Gray*, 88 Miss. 489, [41 South. 188].)

2. As to the constitutionality of the statute, the first proposition is that it is a special and local law and that, under the provisions of section 3 of article XI of the constitution as amended in 1894, no county can be enlarged except in pursuance of a general law. The opening clause of the section declares that "the legislature, by general and uniform laws, may provide for the formation of new counties." This clause constitutes the entire amendment of 1894, which consisted of merely adding this clause at the beginning of the section without changing the remainder. Prior to that time the legislature, under the section as it then existed, had full power to create a new county at any time by either a special or a general law, provided it contained a population of five thousand inhabitants and the boundary thereof was not within five miles of the county seat of any other county. It was a power which had been frequently exercised, and under it the new counties of Orange, Glenn, Riverside, Madera, and Kings were formed. (Stats. 1889, p. 123; Stats. 1891, p. 98; Stats. 1893, pp. 158, 168, 176; *People* v. *McFadden*, 81 Cal. 489, [15 Am. St. Rep. 66, 22 Pac. 851]; *Los Angeles County* v. *Orange County*, 97 Cal. 329, [32 Pac. 316]; *People* v. *Glenn County*, 100 Cal. 424, [38 Am. St. Rep. 305, 35 Pac. 302]; *Tulare*

*County* v. *Kings County,* 117 Cal. 197, 11 Cyc. 349, [49 Pac. 8].)

The amendment in question was proposed by the legislature of 1893. It was at that session that the special laws were enacted creating the counties of Riverside, Madera, and Kings. It is commonly understood that the annoyance to the members, the time occupied in the passage of these acts, and the scandalous reports arising therefrom were the moving causes which induced the legislature to propose the amendment. So far as we are advised, the practice of changing county lines by special laws was not considered as among the evils to be cured thereby. There was, therefore, no necessity, in framing the amendment, to choose language broad enough to include the changing of boundaries as well as the formation of new counties in the implied prohibition, and there is nothing in the conditions sought to be remedied which justify us in holding that by the use of the phrase "formation of new counties" in the amendment there was an intention to include the changing of county lines.

A change of the boundaries between two or more counties, leaving all of them existing as corporate entities representing political subdivisions of the state, as before, with their corporate organization unchanged and undisturbed, is in no reasonable sense, so far at least as this constitutional provision is concerned, equivalent to the formation of a new county or new counties. It does not change, renew, or affect the political or corporate organizations of the counties concerned, but merely enlarges or decreases the territorial area of counties already existing. It brings no new county into existence, but recognizes the continuous existence of the old ones. The meaning of the words above quoted should not be enlarged beyond their natural signification. We have no decision of this state on this question, but the authorities of other states confirm this conclusion. In *Crawford County* v. *Marion County,* 16 Ohio, 468, the court says: "The identity of a county does not depend upon its territorial boundaries, but its political organization. . . . A change of boundaries is not the erection of a new county. If its political organization continues, its identity is preserved, its existence dates from the act erecting it, and not the act which may change its boundary." In *Frost* v. *Pfeiffer,* 26 Colo. 338, [58 Pac. 147],

it is declared that "creating a new county, and taking territory from one and adding it to another already in existence, are entirely distinct and separate acts—accomplish different objects, the results of which are entirely dissimilar."

We do not regard the case of *People* v. *Ontario,* 148 Cal. 629, [84 Pac. 205], as contrary to this conclusion. It related to the addition of outlying territory to a city. The opinion refers to the portion of section 6 of article XI of the constitution, providing that "corporations for municipal purposes shall not be created by special laws, but the legislature, by general laws, shall provide for the incorporation, organization, and classification in proportion to population of cities and towns." This provision, it is said, "includes not only the creation of new municipal corporations, but also the matter of adding new territory to an existing corporation and the exclusion of territory embraced in such a corporation from further connection therewith." There was no discussion of the reasons why this is so, but we think sufficient reason is apparent for distinguishing that case from this. An examination of the whole section shows that it necessarily has the meaning ascribed to it in the opinion quoted, for it further provides that all cities "heretofore or hereafter organized . . . shall be subject to and controlled by general laws." A city subject only to general laws cannot, by special laws be enlarged or diminished in size, because, if it could be so affected, it might by that means be entirely destroyed or dissolved. Furthermore, the provision that corporations for municipal purposes shall not be created by special laws forbids the creation of any part of a city, as well as an entire city, by special laws, and as the addition of territory to a city is the creation of a city, in part, it falls within the inhibition and cannot be accomplished by special acts. The addition of territory to a city erects that territory into a part of a municipality, and to that extent it is the incorporation and organization into a city of that which before did not have that character. It is not a mere transfer of territory from one political subdivision to another of the same character, but is a complete change in the political status of the new territory. It was because of these considerations that the general statement above quoted was made. It is not so with the change of county lines. The areas affected by that process

are parts of counties before the change. They are not erected
into counties at that time, but merely transferred from one
county to another. The several counties of the state embrace
the entire area thereof, and an adjustment of the boundaries
whereby territory formerly in one county becomes part of
another is not the formation or creation of a new county in
any sense.

It is claimed that the last clause of section 3, providing that
if a county is "enlarged or created" from territory of another
county it shall be liable for a just proportion of the debts of
such county, evinces an intention to include enlargements and
changes of boundaries within the provisions of the section.
This clause is entirely independent of the preceding part of
the section, so far as the question now · under discussion is
concerned. It does not widen the scope of the implied limita-
tion contained in the first clause, constituting the amendment
of 1894, so as to create an implied prohibition against a change
of county lines by special act  Such power was vested in the
legislature before the amendment of 1894 and had been fre-
quently exercised by it. The amendment did not change the
effect of the section in this respect.

3. The claim that the law conflicts with subdivisions 11, 28,
and 33 of section 25 of article IV and section 1 of article II
of the constitution is also untenable. These provisions were
included in the constitution of 1879 and have been in force
ever since. During that time several changes have been made
in the boundaries of the counties of the state, but these pro-
visions of the constitution have never been regarded as
invalidating the acts making the change.

Subdivisions 11 and 28 prohibit special laws for conducting
elections, "except on the organization of new counties" or
for creating offices and fixing their powers and duties in
counties, townships, election or school districts. The elections
referred to in these subdivisions are the ordinary elections held
to choose civil officers of the state or of its local political
subdivisions. The election authorized by this act is not of
that character. It is merely a means provided for the deter-
mination of the event upon which the change of boundaries
provided in the act is or is not to be made. Certain persons
described in the act, all of whom are electors in the affected
territory, but who do not include all of the electors thereof,

are to declare their minds respecting the change, and if a majority favor it, the change is made, otherwise not. As the legislature has power by special laws to change the boundaries directly and has also the power to make the change contingent upon the happening of such an event, it must follow that it has power to provide the method by which the event is to be determined. The fact that the elections are to be conducted in the same manner as ordinary elections has no bearing on the question. The legislature had full power to adopt that or any other mode of deciding as to the event upon which the law was to become effective or ineffective. The same reasons apply to the matter of the creation of offices and fixing their powers and duties. The prohibition refers to the civil offices to be provided by law for the local government, and it has no application to such temporary offices and officers as may be necessary to carry out the legislative scheme for a change of boundaries. Having power to make the change by special act in any reasonable mode, it must have power to provide in the law for all the special agents necessary to carry out the scheme adopted and to invest them with the necessary power for that purpose.

For like reasons it is clear that the law does not transgress section 1 of article II by prescribing different qualifications for the electors who are to be allowed to vote at the election provided for than those prescribed in that section. The provisions of that section refer to the qualification of electors entitling them to vote at the ordinary elections, local and general, held in the course of the usual functions of civil government. The legislature, if it saw fit, might have provided that the question of the taking effect of the change should be submitted to the vote of the taxpayers or of the heads of the families in the territory, or to any other arbitrarily selected body of persons, and the act would have been valid.

Subdivision 33 forbids a special law in all cases where a general law can be made applicable. The legislature must, in the first instance, determine whether or not a general law can be made applicable in the particular case. The courts will not interfere with its judgment on the subject, unless it clearly and beyond reasonable doubt appears that it adjudged contrary to the fact. (*People* v. *Mullender,* 132 Cal. 221, [64 Pac. 299] ; *People* v. *McFadden,* 81 Cal. 489, [15 Am. St. Rep. 66,

22 Pac. 851].) It does not so appear. A change of county lines under a general law would require concurrent and consistent action by the legislative authority, or by the people, in at least two counties or in some portion thereof, or the creation of a commission or board, to which might be delegated power to entertain a proceeding for that purpose. The court cannot declare that either plan would be so feasible and so conducive to the best interests of the state that a general law would be proper. Since the adoption of the amendment of 1894 a general law has been enacted purporting to provide for the formation of new counties, and consequently it now appears that a general law can be made applicable to that subject. The legislature had, however, prior to that amendment, frequently decided that a general law was not applicable and had created new counties by special law. These laws were held not to be contrary to this subdivision, and the legislative judgment that a special law was necessary was held conclusive upon the courts. It is equally conclusive in the matter of changing county lines. (*People* v. *McFadden,* 81 Cal. 489, [15 Am. St. Rep. 66, 22 Pac. 851] ; *Los Angeles County* v. *Orange County,* 97 Cal. 329, [32 Pac. 316] ; *People* v. *Glenn County,* 100 Cal. 424, [38 Am. St. Rep. 305, 35 Pac. 302] ; *Tulare County* v. *Kings County,* 117 Cal. 197, [49 Pac. 8].)

4. We see no force in the proposition that the act grants special privileges to electors who have resided for ninety days preceding the election in the territory to be transferred to Kings County which are not granted to other electors of that territory or to other electors of Fresno County, and that, for that reason, it violates section 21 of article I. Such right or privilege is not of the class of privileges referred to in that section. (*Ex parte Gerino,* 143 Cal. 415, [77 Pac. 166].) But if it were conceded that such privilege does fall within the scope of the section, the law does not violate its provisions. It forbids the grant of a privilege to any citizen or class of citizens, unless it is granted, upon the same terms, to all citizens. A law applying uniformly to all citizens of a particular class does not violate this section, if the class is one founded upon some natural, intrinsic, or constitutional distinction differentiating its members from the general body from which the class is selected. (*Pasadena* v. *Stimson,* 91 Cal. 238, [27 Pac. 604] ; *Bruch* v. *Columbet,* 104 Cal. 351, [38 Pac. 45] ;

*Krause* v. *Durbrow,* 127 Cal. 684, [60 Pac. 438].) The citizens of the territory to be transferred are directly affected by the act, and, therefore, have a greater interest in the matter than other citizens of the same county. Those who have resided therein for ninety days, have had longer experience and are, in general, a more permanent class than those who have been residents for a shorter period, and they are, therefore, better qualified to act wisely. This class is, therefore, sufficiently distinguished from other citizens of the state or county, and their selection as a class to whose judgment the change should be submitted is fully justified.

That it is competent for the legislature to pass a law which shall be executed only in the event that a majority of a certain class of persons shall declare in favor of it is a principle too well settled to require discussion. (*People* v. *McFadden,* 81 Cal. 489, [15 Am. St. Rep. 66, 22 Pac. 851]; *People* v. *Burr,* 13 Cal. 357; *Hobart* v. *Board,* 17 Cal. 31; *People* v. *Nally,* 49 Cal. 481; *Robinson* v. *Bidwell,* 22 Cal. 379.)

5. It is scarcely necessary to discuss section 13 of article XI, forbidding the delegation of power to any special commission to control, supervise, or interfere with county money or property, or to perform any municipal functions. In each of the special acts heretofore passed creating new counties some special commission of the character here provided has been constituted to carry out the purposes of the act, and such commissions have been upheld as legal and valid bodies. The commission provided in this act does not control, supervise or interfere with county money or property, but merely provides for the holding and certification of an election upon the result of which the execution of the act shall depend. They are but the instruments whereby the event upon which the law depends is to be ascertained. Their functions are not municipal in character. (*People* v. *Ontario,* 148 Cal. 631, [84 Pac. 205].)

6. The act embraces but one general subject, namely, the change of the boundary line between Kings County and Fresno County. All else is but matter of detail and method of procedure provided for the accomplishment of the object intended. The title sufficiently expresses the subject.

7. The last proposition which we deem it necessary to discuss, and the one which presents the greatest difficulty, is that

the act violates certain parts of section 6 of article IV of the constitution, relating to senatorial and assembly districts. The material parts of this section are as follows:

"For the purpose of choosing members of the legislature, the state shall be divided into forty senatorial and eighty assembly districts, as nearly equal in population as may be, and composed of contiguous territory, to be called senatorial and assembly districts. . . . In the formation of such districts, no county, or city and county, shall be divided, unless it contain sufficient population within itself to form two or more districts; nor shall a part of any county, or of any city and county, be united with any other county, or city and county, in forming any district. The census taken under the direction of the Congress of the United States, in the year one thousand eight hundred and eighty, and every ten years thereafter, shall be the basis of fixing and adjusting the legislative districts; and the legislature shall, at its first session after each census, adjust such districts and reapportion the representation so as to preserve them as nearly equal in population as may be."

In pursuance of this section the legislature of 1901, divided the state into legislative districts. The county of Fresno was thereby constituted the twenty-sixth senatorial district, Kings County was declared to be the sixty-second assembly district, and the territory now attempted to be transferred from Fresno County to Kings County, together with other parts of Fresno County adjacent thereto, were declared to constitute the sixtieth assembly district. (Stats. 1901, pp. 539, 545.) Thus it appears that if the proposed change of boundaries takes place, either of several things may ensue, all of which, it is claimed, are, in effect, prohibited by this section of the constitution: All that part of Fresno County proposed to be made a part of Kings County will become a part of the sixty-second assembly district and also a part of the thirty-second senatorial district to which Kings County belongs, or, in the other alternative, a part of Kings County will be united with Fresno County in forming the twenty-sixth senatorial district, and with a part of Fresno County in forming the sixtieth assembly district. In the first alternative there will be a reapportionment of legislative districts at a time when, as it is claimed, the legislature is without power to act in that behalf. In the

second alternative, a part of Fresno County will be united with a part of Kings County to form the sixtieth assembly district and the twenty-sixth senatorial district, which is contrary to the express prohibition of the section quoted, if that prohibition is applicable to a change of county lines during the period between one apportionment and the succeeding one.

We think the true rule deducible from reason and authority is that the legislative districts are not changed by the change in county lines, but that they will remain, as fixed by the General Apportionment Act of 1901, until they are again fixed by the succeeding act in 1911, and that the prohibition against uniting parts of different counties in forming any district limits the power of the legislature in framing the general law for the decennial apportionment, but does not affect its power, included in the general grant of legislative power contained in section 1 of article IV, to alter county boundaries from time to time as it may deem best.

As a good statement of the principles to be observed in the consideration of a question of this character, we quote the following from *State* v. *Stevens,* 112 Wis. 170, [88 N. W. 49]: "The rule of all courts is that a statute will be declared unconstitutional only when it is shown beyond reasonable doubt that it conflicts with the fundamental law. It is equally true that the courts will seek every reasonable mode of reconciliation of the statute with the constitution, and it is only when reconciliation has been found impossible that it will be declared void." To the same effect see *Ex parte Spencer,* 149 Cal. 396, [117 Am. St. Rep. 137, 86 Pac. 896]; *Deyoe* v. *Superior Court,* 140 Cal. 490, [98 Am. St. Rep. 73, 74 Pac. 28]; *Cohen* v. *Wright,* 22 Cal. 308; *People* v. *Westchester Co.,* 147 N. Y. 1, [41 N. E. 563]. Another rule to be observed in construing the constitution itself, is that its various provisions are to be harmonized so that some effect may be given to every part, if it is reasonably possible. (*Marye.* v. *Hart,* 76 Cal. 293, [18 Pac. 325]; *Cohen* v. *Wright,* 22 Cal. 314; *French* v. *Teschemaker,* 24 Cal. 539.)

The creation of a new county would have a like effect upon the legislative districts concerned as a change of boundaries, and if the provisions of section 6 of article IV have any effect at all upon the power of the legislature to change county boundaries, they have the same effect upon the power to create new counties, even by a general law under the present amend-

ment. The power to adjust the legislative districts and the power to form new counties and change county lines are all vested in the legislature by the general grant of legislative power. (Art. IV, sec. 1.) The special provisions relating to these powers, found in other parts of the constitution, must therefore be considered as limitations upon the general grant. The amendment of 1894, aforesaid, relating to the formation of new counties, though couched in the language of a grant, is in fact a limitation, for, prior to its adoption, the legislature had full power over the subject and could act by special law.

The provisions of section 6 of article IV being construed as limitations, and being mandatory and prohibitory, it follows from their terms, and from the application of the maxim, *expressio unius est exclusio alterius,* that the legislative power to form legislative districts can be exercised but once during the period between one United States census and the succeeding one, and that, having been thus exercised in 1901, the districts cannot be again adjusted until the season of 1911. The general rule in regard to constitutional limitations of this character is that that which cannot be done directly cannot be done by indirection. This is a case to which the rule should be applied, since great abuses might follow a too frequent exercise of the power. The consequence is that, if a change of county lines, or the formation of a new county, must have the effect of making a corresponding change of legislative districts, the legislature would be without power to make a change of either character, except at the time of the decennial adjustment of legislative districts. If this be so, it would practically destroy the power to form new counties, or change county lines, either by general or special laws. If attempted by either mode, the change could not take effect except at the moment the succeeding Legislative District Act became a law, and then, only in the event that the new districts corresponded to the impending change in the counties or county boundaries. But, as these changes would not be in force when the Apportionment Act was in process of passage, and as one legislature cannot bind a succeeding one and still less can an inchoate proceeding to form a new county bind the legislature, the district bill might not be made to conform to the changes proposed in the counties, and thus it would be in the power of the legislature, in passing the legislative district law, to render

nugatory the previous special law changing boundaries and previous proceedings under general laws attempting to form new counties. A construction leading to such absurd results and to such extraordinary difficulties in the exercise of one of the ordinary legislative powers should not be adopted unless absolutely necessary. The terms of section 6 do not make it necessary. The limitations therein contained were intended to constitute limitations solely upon the power to form legislative districts and apply only to the very act by which the power is to be exercised. It is "in the *formation* of such districts" and "in *forming* any district," that counties may not be divided nor parts of two counties united. Neither the making of new counties, nor the change of county lines, is the subject of these limitations and they are not directly forbidden thereby. Their purpose is solely to prescribe the manner in which the legislative districts are to be formed. The mandate is that "the state" shall be divided into legislative districts, not that the several counties shall be so divided. The division is not to be made by counties, but according to population, and county lines are used only for convenience and to promote harmonious action by the voters. The reasonable conclusion is that a change in county lines, or the formation of new counties, does not affect the legislative districts, but leaves them to be changed at the next decennial adjustment, and that the division into districts has no effect upon any change, or proposed change, in the counties or in their boundaries.

The result is that when a new county is formed or a change made in the boundaries, there must be, temporarily, a part of two counties embraced in one legislative district. This is a necessary consequence of the fact that the power to make new counties and change boundaries is given without limitation in that respect, and by the same instrument which contains the limitation upon the power to form legislative districts. It is plain that it could not have been the intention, by the limitation upon the method of forming legislative districts, to destroy or prevent the exercise of the power to change boundary lines or form new counties. The only escape from the dilemma is to hold that the provision as to legislative districts is, temporarily, and as to the districts affected, in abeyance because of the exercise of another power of equal importance and potency. (See *People* v. *Pendegast,* 96 Cal. 294, [31 Pac. 103].)

If the change is made as the act provides, the old senatorial and assembly districts will remain with the same boundaries as before. After the change, the officers of Kings County concerned in the elections therein, will be required to perform the necessary duties for the election of members of the legislature, and to make their ballots, certificates and returns, correspond with the new conditions. There may be some difficulty encountered in doing this, but they do not appear to be insuperable. If they should prove so, the fault will lie with the legislature which made the change in boundaries without providing the necessary modifications in the manner of conducting and returning the elections in those districts so as to preserve the right of its citizens to participate therein. But we do not anticipate such difficulty. The parts of the election law which may prove inconsistent with the rights of a citizen must give way and its substantial provisions for the holding and return of the election must be followed.

The weight of authority in other states is in favor of these conclusions. In *State ex rel Evans* v. *Dudley,* 1 Ohio St. 446, where the constitutional provisions were similar, the court said: "The truth is, the power to make new counties and change county lines has always existed under both constitutions; under that now in force, it is true, subject to very important safeguards. Its exercise under either, since the apportionment made by the convention, might work the inconvenience of dividing a county into different senatorial districts, but could not in any manner deprive the inhabitants of their right of representation and suffrage in electing the members of that body, or work any change in the boundaries of the districts. This inconvenience should constitute a very strong argument against the exercise of the power, unless in case of strong necessity, but cannot in the least detract from the power itself." The act here in question does not purport to make any change in the legislative districts. In Michigan the constitutional provisions were similar to ours. A law changing county boundaries was held void in *People* v. *Holihan,* 29 Mich. 116, chiefly because the act was construed to have the effect of changing the boundaries of the districts to conform to the new county lines, and that, as that was forbidden by the constitution, the whole law fell with it. Subsequently in *Bay County* v. *Bullock,* 51 Mich, 544, [16 N. W. 896], in consider-

ing another law creating a new county out of a part of a legislative district but silent as to any change in the boundaries of the district, the law was declared valid, but the legislative district, it was said, remained unchanged, and the constitutional objection was thereby obviated. *People* v. *Holihan* was virtually overruled. In Massachusetts, at one time, the towns were given the right to a maximum number of representatives in the legislature and could, at the town meeting, choose whether to be represented or not and fix the number of representatives, within the maximum, to be elected. It was said that by the constitution this representation was a right pertaining to the town as a political body or corporation, to be exercised by its inhabitants in town meeting, and that a law attempting to abolish the town of Charlestown and to annex its territory to Boston, without providing any means by which it could exercise this right, was invalid, because it deprived the inhabitants of their privilege of selecting representatives as a town. (*Warren* v. *Mayor*, 68 Mass., (2 Gray), 84, 101.) Afterward, the mode of apportioning representation in the legislature was changed to the district method, with restrictions similar to ours. Charlestown was then annexed to Boston, the act being silent as to legislative districts. It was held that the districts remained unaffected, that the right to representation under the new plan did not pertain to the town, as such, but to the district, and that the legislature had power to abolish the town and make it a part of the city of Boston, provided the districts were not changed by the act. (*Stone* v. *Charlestown*, 114 Mass. 226.) The following cases, decided upon constitutional provisions such as we have on the subject, hold that a change of boundaries, or the formation of new counties, at a time when the legislative districts cannot be changed, is valid for all other purposes, but that the legislative districts are unaffected thereby and remain the same until the next general apportionment, and have the right to their representation in the legislature the same as before the changes were made: (*State* v. *Stevens*, 112 Wis. 170, [88 N. W. 48]; *Bay County* v. *Bullock*, 51 Mich. 544, [16 N. W. 896]; *Smith* v. *Saginaw*, 81 Mich. 123, [45 N. W. 964]; *Stone* v. *Charlestown*, 114 Mass. 226; *Wade* v. *Richmond*, 18 Grat. (Va.) 608; *Commissions* v. *Ballard*, 69 N. C. 18; *People* v. *Westchester County*, 147 N. Y. 1, [41 N. E. 563]; Opinion of

Justices, 60 Mass. (6 Cush.) 578.)    Particular attention is directed to the able discussion of the subject in *State* v. *Stevens, supra.*    In the New York case, it is true, the section of the constitution, as to assembly districts, provided that "Nothing in this section shall prevent the division at any time of counties and towns and the erection of new towns and counties by the legislature," a provision which, so far as assembly districts were concerned, allowed a change of county lines, notwithstanding the other provisions to the effect that no such district should be composed of parts of two counties. This provision was evidently inserted to evade the force of the decision in *Lanning* v. *Carpenter,* 20 N. Y. 447, holding such changes invalid because of the constitutional inhibition. Some weight seems to have been given to this exception in the discussion in *People* v. *Westchester County, supra.*    But no such provision was contained in the sections relating to senatorial and judicial districts, and these sections also contain limitations which would have made the law void if the effect here contended for by the respondent had been given to them. Nevertheless, the law was held valid and the legislative and judicial districts were held to remain unaffected by the change in the county line.    The decision practically overrules *Lanning* v. *Carpenter,* which is the case on which the respondent here places his chief reliance.

We are of the opinion that the act is valid, and that the court should not have enjoined the execution of it by the persons appointed for that purpose.    It is proper to add that we regard the provision in the act requiring the commissioners to order and hold the contemplated election within sixty days after their first meeting, as directory only, and that, as they were prevented from so doing by the injunction in this case, it will be lawful for them to proceed to perform that duty within sixty days after the going down of the *remittitur* herein.

The judgment is reversed, with directions to the court below to dismiss the action.

Angellotti, J., Sloss, J., McFarland, J., Lorigan, J., Henshaw, J., and Beatty, C. J., concurred.

Rehearing denied.
CLII Cal.—16