[S. F. No. 24589. Sept. 15, 1983.]

LEGISLATURE OF THE STATE OF CALIFORNIA et al.,
Petitioners, v.
GEORGE DEUKMEJIAN, as Governor, etc., et al., Respondents;
DON SEBASTIANI et al., Real Parties in Interest.

[S. F. No. 24596. Sept. 15, 1983.]

GLENN M. ANDERSON et al., Petitioners, v.
GEORGE DEUKMEJIAN, as Governor, etc., et al., Respondents;
DON SEBASTIANI et al., Real Parties in Interest.

**COUNSEL**

Joseph Remcho, Robin B. Johansen, Kathleen J. Purcell, Barbara A. Brenner, Remcho, Johansen & Purcell, Charles C. Marson, Irell & Manella, Richard H. Borow, Jonathan H. Steinberg, Donna R. Hecht, Daniel Hays Lowenstein, Steven Shiffrin and Bruce Wessel for Petitioners.

J. Albert Woll, Laurence Gold, Marsha S. Berson, Fred H. Altshuler, Stephen P. Berzon, Michael Rubin, Altshuler & Berson, Charles P. Scully, Donald C. Carroll, Charles P. Scully II, John B. Clausen, County Counsel (Contra Costa). Arthur W. Walenta, Assistant County Counsel, Donald Clark, County Counsel (Santa Clara), Robert Menifee, Deputy County Counsel, Joaquin G. Avila, Morris J. Baller, John E. Huerta, Douglas E. Mirell, Susan Lerner, Barbara S. Bryant, Farnsworth, Saperstein & Brand, Burton S. Levinson, Nathaniel S. Colley, Ephraim Margolin and Sandra Coliver as Amici Curiae on behalf of Petitioners.

John K. Van de Kamp, Attorney General, Richard D. Martland, Chief Assistant Attorney General, N. Eugene Hill and Paul H. Dobson, Deputy Attorneys General, and Vance W. Raye for Respondents.

Pillsbury, Madison & Sutro, Walter R. Allan, Vaughn R. Walker, Frederick K. Lowell and Kevin M. Fong for Real Parties in Interest.

OPINION

THE COURT.*—In this case we are called upon to determine the constitutionality of an attempt—novel in the history of this state—to readjust state legislative and congressional district boundaries through the statutory initiative process after the Legislature has already done so. We are asked by the proponents of the initiative to create an exception to the constitutionally mandated and long-established rule that redistricting may occur only once within the 10-year period following a federal census. We conclude, based upon the principle that in the enactment of statutes the constitutional limitations that bind the Legislature apply with equal force to the people's reserved power of initiative, that such an exception cannot be justified. Therefore, the proposed initiative is constitutionally impermissible and may not be submitted to the voters.

Petitioners in these consolidated proceedings are the Legislature of the State of California; Willie L. Brown, Jr., a taxpayer and Speaker of the California Assembly; David Roberti, a taxpayer and President Pro Tempore of the California Senate; three qualified electors; and twenty-eight California members of the House of Representatives. Respondents are the Governor; the Secretary of State; and the Clerk of the City and County of San Francisco and its Registrar of Voters, the latter two officials being sued individually and as representatives of all county clerks and registrars of voters of the state.[1] Real parties in interest are Don Sebastiani, Parker Montgomery, and Quentin Kopp, the proponents of the initiative measure which is the subject of this petition.[2]

Petitioners seek mandamus to restrain respondents, all of whom have official duties in the conduct and/or certification of elections in California,

---

*Before Bird, C. J., Mosk, J., Richardson, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J.

[1]The legislative petitioners have named the county clerk and registrar of voters as respondents individually and as representatives of a class consisting of all clerks and registrars in the state. Because the election cannot be held or the results certified without the participation of the Secretary of State, and issuance of a peremptory writ of mandate directed to her alone would be sufficient to accord petitioners substantially all of the relief they seek, it is not necessary that we determine whether this proceeding may be prosecuted as a defendant class action pursuant to Code of Civil Procedure section 382. We have not, therefore, certified a class or directed petitioners to serve notice on the county clerks and registrars of the state.

[2]Quentin Kopp, named as a real party in interest, has not appeared in these proceedings.

from expending any public funds or otherwise acting to carry out a special election proclaimed by respondent Governor on July 18, 1983, to be conducted on December 13, 1983,[3] for the purpose of submitting to the voters the initiative[4] measure of which the real parties in interest are proponents. The initiative, if adopted, would realign the Assembly, Senate and congressional districts of California and repeal statutes enacted by the Legislature during the 1983-1984 First Extraordinary Session.[5]

The principal claim of both the legislative and congressional petitioners is that the initiative measure is invalid because it represents an attempt to redistrict more than once in a decennial period—an attempt which both sets of petitioners say is barred by article XXI of the California Constitution, and which congressional petitioners also oppose on the basis that it would

---

[3]Special elections are ordered by the Governor pursuant to Elections Code section 2651:
"The Governor shall call all statewide special elections by issuing a proclamation pursuant to Section 2553. In the case of a vacancy in a congressional or legislative office the Governor shall issue a proclamation, within 14 calendar days of the occurrence of the vacancy, calling a special election in accordance with Section 7200.5.
"A copy of the proclamation shall be sent to the board of supervisors of every affected county and a notice of election published in accordance with the provisions of Section 2554."
Section 2553 provides: "For each statewide election the Governor shall issue a proclamation calling the election. The proclamation shall be issued by the Governor under his or her hand and the Great Seal of the state no later than the 148th day prior to the election and shall state the time of the election and the offices, if any, to be filled. Copies of the proclamation shall be transmitted by the Governor to the boards of supervisors of the counties."

[4]The initiative power is now reserved and defined in article II, section 8 of the California Constitution:
"(a) The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them.
"(b) An initiative measure may be proposed by presenting to the Secretary of State a petition that sets forth the text of the proposed statute or amendment to the Constitution and is certified to have been signed by electors equal in number to 5 percent in the case of a statute, and 8 percent in the case of an amendment to the Constitution, of the votes for all candidates for Governor at the last gubernatorial election.
"(c) The Secretary of State shall then submit the measure at the next general election held at least 131 days after it qualifies or at any special statewide election held prior to that general election. The Governor may call a special statewide election for the measure.
"(d) An initiative measure embracing more than one subject may not be submitted to the electors or have any effect."
All footnote and parenthetical references to constitutional provisions hereinafter are to the California Constitution unless otherwise indicated.

[5]Statutes 1982, First Extraordinary Session 1982-1983, chapter 6, section 2, chapter 8, section 2. The initiative would repeal and replace chapters 1 through 4 of division 18 of the Elections Code, which divisions encompass sections 30000 through 30030, and establish the boundaries respectively of the Assembly, Senate, and congressional districts.

violate article I, section 2, of the United States Constitution,[6] and the Permanent Reapportionment Act (2 U.S.C. § 2a).[7]

Legislative and congressional petitioners join also in challenging the initiative on the ground that the districts it seeks to create violate, in the case of the congressional districts, the "equal representation" standard (*Karcher* v. *Daggett* (1983) — U.S. — [77 L.Ed.2d 133, 103 S.Ct. 2633]), and as to both types of districts the equal protection clauses of both the state and federal Constitutions. (U.S. Const., 14th Amend.; art. I, § 7; *Reynolds* v. *Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362]; *Baker* v. *Carr* (1962) 369 U.S. 186 [7 L.Ed.2d 663, 82 S.Ct. 691]; *Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638 [180 Cal.Rptr. 297, 639 P.2d 939].) The legislative petitioners argue also that the initiative unnecessarily disenfranchises certain voters, thus denying them due process and equal protection of the laws; that it fails to provide for redistricting by the Legislature in 1991 as mandated by article XXI; and that it cannot be understood by the voters because it is not accompanied by maps or other descriptive material adequate to permit them to visualize and comprehend the new districts.

Finally, amici curiae who have filed briefs in support of petitioners assert that article XXI permits adjustment of district boundaries only by the Legislature, and that the initiative violates the proscription contained in article II, section 8, subdivision (d), of the California Constitution against initiative measures "embracing more than one subject."

We issued an alternative writ of mandate to consider the issues thus raised. Mandamus is an appropriate remedy. (*Assembly* v. *Deukmejian, supra,* 30 Cal.3d 638, 646.)

### PROPRIETY OF PREELECTION REVIEW

■ "As we have frequently observed, it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity. [Citations.]" (*Brosnahan* v. *Eu* (1982) 31 Cal.3d 1, 4 [181 Cal.Rptr. 100, 641 P.2d 200].) That principle is a salutary one, and where appropriate we adhere to it. However, where the requisite

---

[6]Subdivision 3, of article I, section 2, provides in pertinent part: "Representatives . . . shall be apportioned among the several States which may be included within this Union, according to their respective numbers, . . . The actual enumeration shall be made within three years after the first meeting of the Congress of the United States, and within every subsequent term of ten years, in such manner as they shall by law direct. . . ."

[7]That act provides in subdivision (a): "On the first day, or within one week thereafter, of the first regular session of the Eighty-second Congress and of each fifth Congress thereafter, the President shall transmit to the Congress a statement showing the whole number of persons in each State . . . as ascertained under . . . each subsequent decennial census of the

showing of invalidity has been made, departure from the general rule is compelled.

The general rule favoring postelection review contemplates that no serious consequences will result if consideration of the validity of a measure is delayed until after an election. Under those circumstances, the normal arguments in favor of the "passive virtues" suggest that a court not adjudicate an issue until it is clearly required to do so. If the measure passes, there will be ample time to rule on its validity. If it fails, judicial action will not be required.

In this case both state and local election officials—while not taking any position on the substantive resolution of the case—have urged the court to decide the matter before the election because of what they consider to be the dire consequences of delay. They point, in part, to the high costs—estimated at $15 million—which both state and local governments will be required to absorb if this special election is allowed to proceed, and suggest that if the initiative is in fact invalid this expenditure will be for naught. And they point—most significantly, in our view—to the very substantial problems for election officials, candidates, and supporters that would exist if our consideration of this matter were deferred beyond December. Indeed, the Secretary of State advises us that implementation of changes in district boundaries so close to the time at which procedures preliminary to the conduct of the June 1984 primary election must be undertaken would make the orderly conduct of that election impossible.[8] Similar considerations underlay this court's decision to intervene prior to the election on the challenged reapportionment referenda in *Assembly* v. *Deukmejian, supra,* 30 Cal.3d 638.

Another and most formidable argument advanced by petitioners against the validity of the initiative is that the Legislature has already completed the constitutional duty of establishing district boundaries for this decennial period. This argument, if correct, would constitute an absolute bar to a further redistricting prior to the 1990 decennial census, whether by initiative or legislative action. As Justice Mosk observed in his separate opinion in *Brosnahan* v. *Eu, supra,* 31 Cal.3d 1, 6: "[E]lection officials have been ordered not to place initiative and referendum proposals on the ballot on the ground that the electorate did not have the power to enact them since they were not legislative in character [citations], the subject matter was not

population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member."

[8]While not taking an adversary position in the proceeding, the Secretary of State has provided a calendar of statutory deadlines with which election officials and candidates cannot comply unless they have knowledge of district boundaries. That calendar appears as Appendix A to this opinion.

a municipal affair [citations], or the proposal amounted to a revision of the Constitution rather than an amendment thereto. [Citation.]'' Here, as in those cases, the challenge goes to the power of the electorate to adopt the proposal in the first instance. This challenge does not require even a cursory examination of the substance of the initiative itself. The question raised is, in a sense, jurisdictional.

Moreover, and unlike the situation in *Brosnahan,* preelection review is here essential to further the purposes underlying the principle which is being invoked. As we shall explain, one of the primary purposes of the one-apportionment-per-decade rule upon which petitioners rely is to avoid subjecting the body politic unnecessarily to a repetition of the turmoil and disruption which inevitably surround reapportionment and redistricting. Were we to defer judicial review until after the election, and then hold the initiative invalid on that ground, our ruling would come too late; part of the reason for the existence of the rule would already have been frustrated by default.

Finally, having issued the alternative writ and carefully considered the briefs and oral argument, we have concluded that a ''clear showing of invalidity'' has been made. There seems little reason in law or in policy for keeping that conclusion a secret. We turn, then, to the events which precipitated the instant dispute.

### Factual Background

In September 1981 the Legislature passed, and the Governor signed, three statutes redefining the state's congressional, Senate and Assembly districts. Referenda petitions subjecting the statutes to voter approval were accepted by the Secretary of State in December 1981. In *Assembly* v. *Deukmejian, supra,* 30 Cal.3d 638, filed January 28, 1982, this court upheld the validity of the referenda, ruled that they stayed operation of the statutes pending the referenda election, and judicially adopted the statutes' districts temporarily for the legislative and congressional elections of June and November 1982.

The 1981 statutes were rejected by the voters at the June 1982 referenda election. At the First Extraordinary Session of 1982-1983, convened in December 1982, the Legislature enacted chapter 6, establishing new boundaries for congressional districts, and chapter 8, doing the same for Senate and Assembly districts. Both chapters were signed by then Governor Brown on January 2, 1983. Chapter 8 (legislative districts) became effective im-

mediately as an urgency statute,[9] and chapter 6 (congressional districts) will go into effect on October 17, 1983, the 91st day after the July 19, 1983, adjournment of the extraordinary session. (Art. IV, § 8, subd. (c).)

As an urgency statute, chapter 8 was not subject to a referendum. (Art. II, § 9, subd. (a).) Chapter 6 would have been subject to a referendum under a petition filed by April 1 ("90 days after the enactment date"), but none was filed. (See art. II, § 9, subd. (b).)

The legislative and the congressional petitioners argue that because both chapter 6 and chapter 8 will be effective prior to December 14, 1983, the date upon which the initiative would become effective if adopted by the voters (art. II, § 10, subd. (a)), it may not be adopted because only one valid reapportionment plan for these districts between each decennial federal census is permitted by article XXI. For reasons that we shall explain, we agree.

ONE REAPPORTIONMENT PER DECADE: THE HISTORICAL UNDERSTANDING

■ As adopted in 1879, article IV, section 6 of the California Constitution provided: "[t]he census taken under the direction of the Congress of the United States, in the year one thousand eight hundred and eighty, and every ten years thereafter, shall be the basis of fixing and adjusting the legislative districts; and the Legislature shall, at its first session after each census, adjust such districts and re-apportion the representation so as to preserve them as near equal in population as may be." To the extent that constitutional history offers any basis for ascertaining the intent of the framers of the Constitution of 1879, it supports our conclusion that the drafters intended thereby that the state be redistricted immediately after each decennial census and not again thereafter until the next census. This court has so held repeatedly.

---

[9]Article IV, section 8, subdivisions (c)(1) and (2) and (d) provide that legislation may become effective immediately upon signing if the Legislature so directs:

"(c)(1) Except as provided in paragraph (2) of this subdivision, a statute enacted at a regular session shall go into effect on January 1 next following a 90-day period from the date of enactment of the statute and a statute enacted at a special session shall go into effect on the 91st day after adjournment of the special session at which the bill was passed.

"(2) Statutes calling elections, statutes providing for tax levies or appropriations for the usual current expenses of the State, and urgency statutes shall go into effect immediately upon their enactment.

"(d) Urgency statutes are those necessary for immediate preservation of the public peace, health, or safety. A statement of facts constituting the necessity shall be set forth in one section of the bill. In each house the section and the bill shall be passed separately, each by rollcall vote entered in the journal, two thirds of the membership concurring. An urgency statute may not create or abolish any office or change the salary, term, or duties of any office, or grant any franchise or special privilege, or create any vested right or interest."

More than 75 years ago this court first considered whether a second change in the boundary of a legislative district was permitted by former article IV, section 6, and held that it was not. In *Wheeler* v. *Herbert* (1907) 152 Cal. 224 [92 P. 353], the question was presented in the context of a statute that permitted a change in the boundary between Fresno and Kings Counties which shifted territory from the southernmost part of the former to the latter. A resident of the territory challenged the statute on a variety of grounds. It was claimed that article IV, section 6, did not permit the Legislature to change a legislative district. That would occur, it was argued, if the county lines by which existing districts were defined should change. The court agreed that article IV, section 6, limited the Legislature's power to redistricting only once after each decennial census. Because the statute did not purport to change the legislative districts, we concluded the existing legislative districts would continue and upheld the statute.

Considering the power to change the boundaries of legislative districts, we said: "The provisions of section 6 of article IV being construed as limitations, and being mandatory and prohibitory, it follows from their terms, and from the application of the maxim, *expressio unius est exclusio alterius,* that the legislative power to form legislative districts can be exercised but once during the period between one United States census and the succeeding one, and that, having been thus exercised in 1901, the districts cannot be again adjusted until the season of 1911. The general rule in regard to constitutional limitations of this character is that that which cannot be done directly cannot be done by indirection. This is a case to which the rule should be applied, since great abuses might follow a too frequent exercise of the power." (152 Cal. at p. 237.)

In *Wheeler* v. *Herbert* the court supported its decision by reference to decisions of the courts of several other states which had reached similar conclusions in attempting to harmonize constitutional limitations on redistricting with the power to create or modify boundaries of political subdivisions. (See *People* v. *Board of Sup'rs.* (1895) 147 N.Y. 1 [41 N.E. 563]; *Lanning* v. *Carpenter* (1859) 20 N.Y. 447; *Stone* v. *Charlestown* (1873) 114 Mass. 214, 226-227; *Warren* v. *Mayor* (1854) 68 Mass. (2 Gray) 84, 101; *Opinion of Justices* (1839) 60 Mass. (6 Cush.) 578;[10] *Smith* v. *Saginaw* (1890) 81 Mich. (23 & 24 Fuller) 123 [45 N.W. 964]; *Bay County* v. *Bullock* (1883) 51 Mich. (15 & 16 Chaney) 544 [16 N.W. 896]; *People* ex. rel. *Attorney General* v. *Holihan* (1874) 29 Mich. (7 & 8 Post) 116; *State* ex rel. *Evans* v. *Dudley* (1853) 1 Ohio St. 437; *State* v. *Stevens* (1901) 112

---

[10]See also, *Opinion of Justices* (1839) 60 Mass. (6 Cush.) 575, to the same effect.

Wis. 170 [88 N.W. 48]; *Wade* v. *Richmond* (1868) 18 Grat. (Va.) 583, 608-620; *Commissioners* v. *Ballard* (1873) 69 N.C. 18.)

The Michigan Constitution provided that "each apportionment and the division into representative districts by any board of supervisors shall remain unaltered until the return of another enumeration." The Michigan Supreme Court held that although that limitation on the boards of supervisors did not mention the legislature, the language of the section mandating legislative reapportionment after each state or federal census "was so clear and the design so plain" that it must be read to prohibit additional changes in districts, whether by the legislature or a board of supervisors. As to the express limitation, the court remarked: "The provision noticed was not casually inserted, and without attention to its possible scope. It falls in with others which help to show a settled purpose to organize electoral districts in a way most likely to secure unity of interest and convenience, and to shield them for fixed periods against change." (29 Mich. at p. 118.)

The North Carolina Constitution then provided that the senatorial districts established after each census "shall remain unaltered until after another census."

The New York Constitution provided that legislative and local districts " 'shall remain unaltered until another enumeration shall be made . . . .' " (147 N.Y. at p. 13.) The limitation was in the New York Constitution of 1846 (*Lanning* v. *Carpenter, supra,* 20 N.Y. 447, 451), and the Constitution of 1822 had required a decennial census followed by a new apportionment of members of the Legislature. (*Id.,* at p. 453.)

In *Dowell* v. *McLees* (1926) 199 Cal. 144 [248 P. 511], this court reconfirmed the once-a-decade principle as a matter of constitutional interpretation. There, pursuant to the Consolidation Act of 1913 (Stats. 1913, ch. 311, § 1, p. 577), San Diego and East San Diego had been consolidated in 1923. Thereafter, in 1925, additional territory was annexed to San Diego pursuant to the Annexation Act (Stats. 1913, ch. 312, § 9, p. 594). The 79th and 80th Assembly Districts then encompassed respectively the City of San Diego and the remainder of the county. This court rejected a claim that the consolidation and annexation had altered the boundaries of the 79th Assembly District. The court held, "following the reasoning and conclusions in *Wheeler* v. *Herbert*" (199 Cal. at p. 147): "In fixing and readjusting the boundaries of assembly districts the legislature acts pursuant to the provisions of section 6 of article IV of the constitution. Under that section, which is mandatory and prohibitory, *the power to form legislative districts can be exercised but once during the period between one United States*

*census and the succeeding one* (*Wheeler* v. *Herbert,* 152 Cal. 224), and by the terms of the section, until the legislative power is exercised as therein provided, assemblymen shall be elected by the districts as theretofore established." (*Id.,* at p. 146, italics added.)

More recently, in *Yorty* v. *Anderson* (1963) 60 Cal.2d 312 [33 Cal.Rptr. 97, 384 P.2d 417], this court again recognized the prohibition, announced in *Wheeler* and *Dowell,* against successive district changes in the same inter-census period. Without questioning the continued validity of the general once-a-decade constitutional principle, we went on to explain that that rule did not preclude the Legislature from enacting a second statute if the first one had been invalidated by judicial decision or nullified by referendum. (60 Cal.2d at pp. 316-317.)[11] And in our later decisions, we have uniformly assumed that only one valid plan for legislative and congressional districts may be implemented in a decennial census period. (See *Legislature* v. *Reinecke* (1972) 6 Cal.3d 595, 604 [99 Cal.Rptr. 481, 492 P.2d 385], 7 Cal.3d 92, 93 [101 Cal.Rptr. 552, 496 P.2d 464]; *Assembly* v. *Deukmejian, supra,* 30 Cal.3d 638, 671, 676; *id.,* p. 692 (dis. opn. of Richardson, J.).)[12]

### Interpretation and Application of Article XXI

Although former article IV, section 6, by its terms applied only to legislative districts, it was assumed that the once-a-decade rule of *Wheeler* and *Dowell* applied to congressional districts as well.[13]

On June 3, 1980, article XXI replaced former article IV, section 6. It provides:

---

[11]We stated: "The views expressed herein are not inconsistent with the position taken by this court in *Dowell* v. *McLees,* 199 Cal. 144, 146 [248 P. 511], and *Wheeler* v. *Herbert,* 152 Cal. 224, 237 [92 P. 353], that the power to form legislative districts under section 6 (as it read prior to the 1926 amendment) could be exercised but once during the period between one federal census and the succeeding one. It is apparent that the statements in the opinions related to the effect of a *valid* reapportionment, not one which is inoperative because of a violation of the Constitution, and there is nothing in those decisions which would preclude the Legislature from making a second reapportionment after nullification of its first effort by the courts or by referendum." (60 Cal.2d at pp. 316-317, italics in original.)

[12]As the out-of-state authorities cited in *Wheeler* demonstrate, the once-in-a-decade rule is by no means peculiar to California. As the Supreme Court of Kansas has observed: "It is the general rule that once a valid apportionment law is enacted no future act may be passed by the legislature until after the next regular apportionment period prescribed by the Constitution [citations]." (*Harris* v. *Shanahan* (1963) 192 Kan. 183 [387 P.2d 771, 779-780]; see also, *State* v. *Zimmerman* (1954) 266 Wis. 307 [63 N.W.2d 52].)

[13]See Opinion of Legislative Counsel of California No. 5177 (Mar. 9, 1951) Reapportionment, 1 Assem. J. (1951 Reg. Sess.) page 1796; 18 Ops.Cal.Atty.Gen. 11, 15 (1951).

"SECTION 1. In the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the Legislature shall adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts in conformance with the following standards:

"(a) Each member of the Senate, Assembly, Congress, and the Board of Equalization shall be elected from a single-member district.

"(b) The population of all districts of a particular type shall be reasonably equal.

"(c) Every district shall be contiguous.

"(d) Districts of each type shall be numbered consecutively commencing at the northern boundary of the state and ending at the southern boundary.

"(e) The geographical integrity of any city, county, or city and county, or of any geographical region shall be respected to the extent possible without violating the requirements of any other subdivision of this section."

Article XXI thus expressly includes congressional districts among those subject to the requirement of adjustment following each decennial federal census. ■ Although rephrased, article XXI perpetuates the command of article IV, section 6, by providing that the Legislature "shall adjust the boundary lines" of the affected districts in the year following each federal census. Therefore, absent evidence that the people intended a different interpretation, it must be inferred that in the drafting and adopting of article XXI, the prior judicial interpretation of that language was considered and a similar interpretation of that article was intended. (*In re Jeanice D.* (1980) 28 Cal.3d 210, 216 [168 Cal.Rptr. 455, 617 P.2d 1087]; *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 93 [207 P.2d 47].)

■ ■ ■ ■ The Legislative Analyst's explanation of the measure and the arguments for and against it, set forth in the California Ballot Pamphlet for the Primary Election on June 3, 1980, at which time article XXI was

adopted, reveal no such contrary intent or understanding.[14] "It is a well-recognized rule of construction that after the courts have construed the meaning of any particular word, or expression, and the legislature subsequently undertakes to use these exact words in the same connection, the presumption is almost irresistible that it used them in the precise and technical sense which had been placed upon them by the courts." (*City of Long Beach* v. *Payne* (1935) 3 Cal.2d 184, 191 [44 P.2d 305].) The presumption is equally applicable to measures adopted by popular vote. (*Perry* v. *Jordan, supra*, 34 Cal.2d 87, 93.)

## Real Parties' Challenge to the Application of the Established Once-a-decade Rule

 Real parties in interest do not question the long line of California decisions which hold that the constitutional limitation to a single, valid decennial redistricting precludes a further change in district boundaries by the Legislature. Instead, they offer a novel theory—that the limitation of article XXI applies only to the Legislature and is inapplicable to the people's reserved initiative power. Alternatively, they argue that because the districts established by the Legislature in chapters 6 and 8 have not yet been "used," these statutes have not become effective.

Assuming, but not deciding, that redistricting by initiative is permissible, we find the first proposition puzzling inasmuch as the reserved power to enact statutes by initiative is a legislative power, one that would otherwise reside in the Legislature. It has heretofore been considered to be no greater with respect to the nature and attributes of the statutes that may be enacted than that of the Legislature. Any doubt in this regard was conclusively

---

[14]The ballot pamphlet prepared for the voters prior to the adoption of article XXI supports the conclusion that no change was intended in the limitation of reapportionment to once each decade. The Official Title and Summary Prepared by the Attorney General stated that the measure "[s]ets forth in a new article the standards to which the Legislature is required to conform in adjusting the boundaries of these districts *each decade.*" (Italics added.) The Legislative Analyst's analysis stated in the introductory sentence of the "Background" summary of the measure: "State Senate, Assembly, congressional and Board of Equalization *districts are reapportioned every ten years . . . .*" (Italics added.) Neither the Attorney General's summary nor the Legislative Analyst's explanation of the measure suggested that any change was intended in this regard. None of the arguments for or against the measure suggested any change, and the one argument that mentioned the subject, that of Assemblyman Naylor and Mr. Hofeller, stated that the proposition "would establish reasonable rules for redrawing boundaries for legislative and congressional districts *after each census.*" (Italics added.) (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 3, 1980) pp. 20, 22.) Ballot summaries and arguments may be considered when determining the voters' intent and understanding of a ballot measure. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 246 [149 Cal.Rptr. 239, 583 P.2d 1281].)

dispelled by *Wallace v. Zinman* (1927) 200 Cal. 585 [254 P. 946, 62 A.L.R. 1341], in which it was claimed that an initiative statute was not invalid for failure to conform to the "single-subject rule" applicable to legislative enactments. Noting that the Constitution provided, as it does now in article I, section 26, that "[t]he provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise," this court said: "It has been urged, however, that an initiative measure in its effect is a constitutional amendment, and as constitutional amendments need not conform to the provision of the constitution quoted above, this statute need not so conform to it. We are unable to accord any weight whatsoever to this contention. We do not recognize an initiative measure as having any greater strength or dignity than attaches to any other legislation. Throughout section 1 of article IV of the constitution a distinct line of demarcation is kept between a law or an act and a constitutional amendment. It is only another system added to our plan of state government by a permissive amendment to the constitution, but it was at no time intended that such permissive legislation by direct vote should override the other safeguards of the constitution. If an amendment of the constitution were intended, the provision requires steps to be taken that will apprise the voters thereof so that they may intelligently judge of the fitness of such measure as a constituent part of the organic law." (200 Cal. at p. 593.)

That elementary principle is dispositive of any claim that because this redistricting is to be accomplished by initiative it is exempted from the prohibition of article XXI. ■ A statutory initiative is subject to the same state and federal constitutional limitations as are the Legislature and the statutes which it enacts. (*Hays v. Wood* (1979) 25 Cal.3d 772, 786, fn. 3 [160 Cal.Rptr. 102, 603 P.2d 19]; *Fair Political Practices Com. v. State Personnel Bd.* (1978) 77 Cal.App.3d 52, 56 [143 Cal.Rptr. 393], disapproved on another point in *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168 [172 Cal.Rptr. 487, 624 P.2d 1215]; see also, *Weaver v. Jordan* (1966) 64 Cal.2d 235, 241 [49 Cal.Rptr. 537, 411 P.2d 289], cert. den., 385 U.S. 844 [17 L.Ed.2d 75, 87 S.Ct. 49]; *Mulkey v. Reitman* (1966) 64 Cal.2d 529, 533 [50 Cal.Rptr. 881, 413 P.2d 825], affd. *sub nom. Reitman v. Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627]; *Blotter v. Farrell* (1954) 42 Cal.2d 804, 810 [270 P.2d 481]; *Lucas v. Colorado Gen. Assembly* (1964) 377 U.S. 713, 737 [12 L.Ed.2d 632, 647-648, 84 S.Ct. 1459].)

■ Real parties' reliance on *Associated Home Builders, etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038], is misplaced. That case did not hold, as they suggest, that the power of initiative is not subject to the same limitations as is leg-

islative action. Rather, in overruling *Hurst* v. *City of Burlingame* (1929) 207 Cal. 134, 140-141 [277 P. 308], the court reaffirmed the understanding that the power of the people through the statutory initiative is coextensive with the power of the Legislature. *Associated Home Builders* held only that notice and hearing requirements of zoning laws were not intended to apply to zoning ordinances enacted by initiative. The court warned that a statute which made compliance with *procedural* requirements a prerequisite to enactment of local ordinances would be constitutionally suspect if applied to preclude enactment by initiative of an ordinance on a subject on which the city council could legislate. That decision does not, therefore, support the argument that the people may enact a statute which the Legislature has no power to enact. Although the initiative power must be construed liberally to promote the democratic process (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 219) when utilized to enact statutes, those statutes are subject to the same constitutional limitations and rules of construction as are other statutes. Indeed, real parties do not question the fact that the proposed initiative measure is subject to general constitutional limitations and, in particular, to the other requirements of article XXI.[15] Given the applicability of article XXI in these respects, we see no basis on which to conclude that the once-a-decade limitation does not apply.

This is particularly so since a number of the purposes underlying the once-a-decade limitation—as reflected both in the California decisions and the decisions in other states with comparable constitutional provisions—apply equally to a second redistricting by initiative. The value of repose—which promotes stability in districts and minimizes political battles—was thought to be worth the "cost" of not permitting subsequent legislative attempts to alter existing districts. The instability that would arise from not applying the once-a-decade limitation to initiatives would reintroduce some of the very evils against which the limitation was directed.

Moreover, while there are no judicial decisions in this state precisely on point,[16] more than 30 years ago the California Attorney General, in an

---

[15]Article XXI, quoted in full at pages 671-672, *ante,* requires the establishment of (1) single-member districts, (2) of "reasonably equal" population, (3) which are contiguous, (4) are numbered in a specified manner, and (5) which respect the geographical integrity of cities, counties and geographical regions "to the extent possible without violating the other requirements" of the provision.

[16]In *In re Initiative Petition No. 317, Etc.* (Okla. 1982) 648 P.2d 1207, 1212, the Oklahoma Supreme Court recently held that an initiative measure—which had been filed after a congressional redistricting plan had been adopted—could be put to the voters. In that case, however, the Oklahoma court did not address the question of the effect of a state constitutional once-a-decade limitation on districting by initiative, and thus the decision provides no

opinion addressing numerous legal questions posed by a proposed congressional reapportionment initiative, concluded: "*after a districting statute has become effective, the lawmaking power of the state may not make a second revision, whether by means of a legislative enactment or an initiative statute.*" (18 Ops.Cal.Atty.Gen. 11, 16 (1951).) That opinion, which was written by Leonard M. Friedman, then a deputy attorney general and later a distinguished and highly respected jurist, clearly reflects the prevailing understanding that the initiative is not exempt from the once-a-decade rule.

Traditional rules of constitutional and statutory interpretation yield the same conclusion. Article XXI, like its predecessor, is absolute in its prohibitory aspect. By 1911, when the California constitutional provision providing for the exercise of the initiative power was first adopted (former art. IV, § 1), the once-a-decade rule had already been clearly established. Nothing on the face of the initiative provision reflects either consideration of the use of the initiative to redistrict, or, if such use is permissible, an intent to exclude initiatives from the operation of the once-a-decade rule. Neither respondents nor real parties in interest have called to our attention anything in the adoption of that provision or in its subsequent readoption as article II, section 8, to suggest such an intent. ■ Well-established principles, applicable both to statutes and constitutional provisions, including constitutional provisions added by initiative, as was former section 1 of article IV (*Galvin* v. *Bd. of Supervisors* (1925) 195 Cal. 686, 689-690 [235 P. 450]), require that in the absence of irreconcilable conflict among their various parts, they must be harmonized and construed to give effect to all parts. (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813-814 [114 Cal.Rptr. 577, 523 P.2d 617]; *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 596 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], cert. den., 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) ■ There being no contrary intent apparent and no repugnancy between former article IV, section 6, the predecessor of article XXI as heretofore interpreted, and article II, section 8, we conclude that the initiative process may not be used to do that which the Legislature may not do, to redraw legislative and congressional districts during the decade following a federal decennial census at a time when the Legislature has enacted a valid and effective statute or statutes defining those districts.

■ Real parties offer an alternative argument: they suggest that even if the once-a-decade rule applies to initiatives, it applies only where statutes

authority or guidance on this point.

An article on the use of the initiative in this area reports various instances in which the initiative has been used to establish or restructure ground rules for reapportionment, but none in which it has been used to redistrict. (Goldberg, *The People Legislate* (1966) 55 National Civic Rev. 82.)

defining the districts have become "effective," and they argue that chapters 6 and 8 have not yet become effective because no election has been held pursuant to their provisions.

Acceptance of this proposition, however, would require that we depart from the constitutional provisions and established rules governing the effective date of statutes. The effective date of statutes is governed by article IV, section 8. Pursuant to that provision chapter 8, reapportioning legislative districts, became effective as an urgency measure when signed by the Governor on January 2, 1983. No referendum petition having been filed, chapter 6, reapportioning congressional districts, will become effective on October 17, 1983.

Real parties offer no persuasive authority to support their argument that these statutes have not or will not become effective prior to the date on which this initiative measure could be enacted.[17] They suggest that because the statutes have not been "implemented," and because actions contesting their validity have been filed, we should not consider their adoption as constituting the single, valid decennial districting permitted by article XXI.

The Wisconsin Supreme Court rejected a similar argument in *State v. Zimmerman, supra,* 63 N.W.2d 52. There, the question was whether a 1953 redistricting statute violated that state's Constitution which permitted no more than one legislative districting between two federal enumerations. It was argued that the Legislature was free to modify the districts up to January 1, 1954, the date on which the 1951 redistricting statute became operative by its terms. In rejecting that argument, the court stated: "[T]he passage of the [earlier] Act exercised and exhausted the power of the legislature to redistrict during the present interval . . . . In the absence of a successful attack upon its constitutionality it was a reapportionment, directed by the constitution to be done once and only once following each federal

---

[17]*Sloan v. Donoghue* (1942) 20 Cal.2d 607 [127 P.2d 922], on which real parties rely, held that a reapportionment was not "effective" at the time the Governor proclaimed a special election to fill a vacancy in a congressional seat occasioned by the death of the incumbent prior to the expiration of his term. The reapportionment statute enacted before his death would govern the next primary and general election. This court held that the district from which the decedent had been elected continued intact inasmuch as nothing in the reapportionment legislation reflected an intent that it apply to vacancies occurring before the next election, and to so interpret it would lead to arbitrary and capricious results. (20 Cal.2d at pp. 611-612.) The court considered neither the question of whether former section 6 of article IV would permit earlier application of a reapportionment statute, nor the question of when the prohibitory aspect of the section operated to preclude a second reapportionment. *Sloan* was reaffirmed in *Legislature v. Reinecke* (1973) 10 Cal.3d 396, 404 [110 Cal.Rptr. 718, 516 P.2d 6], in which we recognized stability and continuity of representation and orderly operation as desirable goals in the redistricting process. (*Id.*, at pp. 405-406.)

census, which passed beyond the legislature's power of revision at the date of the referendum at the very latest." (63 N.W.2d at p. 56.)

Thus, implementation is irrelevant to the effectiveness of the legislation. The Legislature has fulfilled its obligation to adjust the legislative and congressional districts and, unless invalidated, they may not be changed again until the 1990 census has been completed.

Incumbent and would-be office holders, party organizations, and residents of the districts established thereby, are entitled to rely on the districts delineated in chapters 6 and 8 in formulating plans to stand for election or to organize to support those who do. In that sense, the statutes may have been "implemented" already. Only unacceptable and unjustified uncertainty could follow a departure from recognition of the constitutionally mandated effective date of legislation establishing legislative and congressional districts as the date on which the mandatory aspect of article XXI is fulfilled and the prohibitory function activated.

The pendency of actions challenging the validity of chapters 6 and 8 is also irrelevant. This is not an action brought for the purpose of determining the validity of chapters 6 and 8. Therefore, the usual rule that the legislation bears a strong presumption of validity is applicable (*In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204]; *Martin* v. *Riley* (1942) 20 Cal.2d 28, 39 [123 P.2d 488]), and unless and until judicially declared invalid, chapters 6 and 8 are effective statutes for purposes of determining whether article XXI bars the adoption of a new and different statutory plan, whether by the Legislature or the people through their reserved initiative power.

Real parties argue that the districts established by chapters 6 and 8 are constitutionally impermissible, asserting that they unnecessarily dilute the strength of minority voters, are not contiguous and compact, have excessive deviations from population equality, and are not "essentially different" from the district plans rejected in the 1982 referenda. They acknowledge that these claims are based on factual allegations which, if controverted, would require a reference (*Holt* v. *Kelly* (1978) 20 Cal.3d 560, 562 [143 Cal.Rptr. 625, 574 P.2d 441]), but ask that we nonetheless consider their challenge to the validity of the statutes in this proceeding. We decline the invitation.

As real parties have acknowledged, other actions in which the validity of the statutes is challenged are already pending. The question before this court is whether at the time the initiative petition was presented for filing with the

Secretary of State pursuant to Elections Code section 3520 et seq., a presumptively valid districting statute or statutes had been enacted which would become effective prior to the date on which the initiative could be submitted to the voters. ▮ Inasmuch as the Secretary of State has no discretion to refuse to submit a properly qualified initiative measure to the voters (*Farley* v. *Healey* (1967) 67 Cal.2d 325, 327 [62 Cal.Rptr. 26, 431 P.2d 650]), any challenge based on a claim that the measure is one that may not be presented to the voters must be promptly made and determined by petition for writ of mandate. (See *McFadden* v. *Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787].) ▮ Where, as here, the object of the petition is to prevent submission of the measure to the voters at all, the time constraints within which a judicial determination of the challenge must be made preclude expanding the scope of the proceeding beyond the limited question of whether the once-a-decade rule applies to the people's reserved power of initiative. The proponents of the initiative were not without opportunity to challenge the validity of sections 6 and 8 prior to their qualification of the initiative. Both mandate and declaratory relief actions were available to them. (See *Yorty* v. *Anderson, supra,* 60 Cal.2d 312, 317.) Having bypassed these remedies, their request that we undertake an examination of the districts created by those statutes at a time when the initiative has qualified and an election has been scheduled, comes too late.

Finally, real parties argue that application of these established constitutional limitations will exclude the people from the reapportionment process and give legislators uncontrolled power in an area in which they may have a conflict of interest. Real parties' contention is that it is difficult for those seeking to redistrict through the initiative process to qualify an initiative for the ballot before the Legislature acts, and that the Legislature—through use of an "urgency" clause—may be able to foreclose use of the referendum. There are several answers to these arguments.

First, assuming that the initiative is generally available in the redistricting process notwithstanding the command of article XXI that *"[t]he Legislature shall* adjust the boundary lines" (italics added), it is by no means clear that the Legislature will always be in a position to preempt use of the initiative. Indeed, there have been recent occasions in California in which the Legislature was slow or failed to act, or the Governor vetoed its enactments, and ample time for qualification of an initiative was available.

Second, redistricting is not the only context in which the use of the initiative may be preempted by legislative action. There are a number of legislative actions—including, for example, immediate and irrevocable expenditures of funds—that cannot effectively be undone by a subsequent initiative

measure and that can be prevented, if at all, only by referendum. That is an inherent feature of the balance between popular control and representative government reflected in this state's Constitution.

Third, constitutional standards embodied in both the state and federal Constitutions impose significant restraints on potential legislative abuse or discrimination in the reapportionment process. (E.g., art. XXI; U.S. Const., art. I, § 7, 14th Amend.; *Baker* v. *Carr, supra,* 369 U.S. 186; *Karcher* v. *Daggett, supra,* — U.S. —.) Thus, real parties' fears of unrestrained legislative action are without substance.

█ Finally, the possibility that the Legislature may on rare occasions foreclose use of the referendum through a declaration of urgency adopted by two-thirds vote[18] is an inherent feature of our constitutional system. The framers of the initiative and referendum provisions and the people in adopting those provisions deliberately accepted this limitation upon the reserved power of the electorate. The existence of this limitation upon the referendum is not a justifiable basis for extending use of the initiative into areas not permitted by the Constitution.

Real parties argue that we should exempt initiatives from the once-a-decade principle, suggesting at the same time that we might "create" a new rule which would allow two opportunities to redistrict each decade, once by the Legislature and once by initiative, provided the Legislature acts first. This we decline to do. █ The people of this state, as the ultimate source of legitimate political power, are of course free through constitutional amendment to adopt whatever changes in the existing system they consider appropriate, subject only to limitations contained in the Constitution of the United States. Whatever the merits of possible alternative constitutional mechanisms, it is manifest that our role is simply to apply the applicable constitutional provisions as they currently exist. Under the well-established constitutional principles that we have reviewed, it is clear that because one presumptively valid redistricting plan based on the 1980 census has already been adopted, article XXI prohibits the adoption of a second redistricting plan either by the Legislature or by initiative.[19]

---

[18]As applied in this case, the argument is more theoretical than real. The congressional redistricting statute (ch. 6) was not adopted on an "urgency" basis, yet apparently there was no attempt to qualify a referendum as to that statute. Nor has there been any cognizable challenge to the declaration of urgency with respect to the state legislative redistricting statute (ch. 8) (see *Stockburger* v. *Jordan* (1938) 10 Cal.2d 636, 642 [76 P.2d 674]).

[19]Some members of the court are of the opinion that the initiative also violates the one-subject rule. (Art. II, § 8, subd. (d).) In their view, legislative reapportionment and congressional reapportionment are separate subjects, as determined by origin (i.e., the number of legislators is prescribed by the state Constitution, the number of representatives by federal

Let a writ of mandate issue restraining respondents from expending any public funds or otherwise acting to carry out the special election proclaimed by respondent Governor to be conducted on December 13, 1983.

**RICHARDSON, J.**—I respectfully dissent.

For the first time in 35 years this court has removed from the ballot a qualified initiative measure, thereby preventing the people of California from voting on a subject of great importance to them—the reapportionment of their legislative boundaries, federal and state. (See *McFadden* v. *Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787].) I regret this defeat of the people's right to vote.

In blocking this election, the majority disregards the well established threshold rule of deference to the people's franchise. Only last year we reaffirmed the principle that we will seldom interfere with the people's exercise of their cherished vote: "[I]t is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures *after* an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, *in the absence of some clear showing of invalidity.* [Citations.]" (*Brosnahan* v. *Eu* (1982) 31 Cal.3d 1, 4 [181 Cal.Rptr. 100, 641 P.2d 200], italics added.) An appellate court recently expressed the same rule in this way: "*Even grave doubts* as to the constitutionality of an initiative measure do not compel a court to determine its validity prior to its submission to the electorate. [Citations.]" (*Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, 256 [101 Cal.Rptr. 628], italics added.)

Neither the "clear invalidity" nor "grave doubts" as to the initiative has been demonstrated. To the contrary, the measure is plainly constitutional and valid. I am not alone in this view. After a thorough analysis and on March 21, 1983, the Legislature's own attorney, the Legislative Counsel of California, concluded that "The people may enact an initiative statute which adjusts the boundary lines of congressional or legislative districts . . . provided the statute adjusting the boundary lines takes effect in time for the orderly conduct of the 1984 Direct Primary elections." The legislative leadership has rejected this advice and now seeks from this court a second opinion. However, even if my colleagues entertained "grave doubts," we should not prohibit the people themselves from expressing their own will regarding the boundaries which the Legislature has again sought to impose upon them.

law), by legislative practice (i.e., redistricting has always been undertaken by separate bills for the Assembly, the Senate and for congressional representatives), and by voter consideration (e.g., Proposition 10 [congressional districts], Proposition 11 [Senate districts], Proposition 12 [Assembly districts], Primary Election, June 8, 1982.)

The majority, conceding that the foregoing rule of deference ". . . is a salutary one, and where appropriate we adhere to it" (*ante,* pp. 665-666) nonetheless rejects it assertedly because of the "high cost" of the election and problems relating to the timing of the administrative deadlines for the 1984 elections. (*Ante,* pp. 665-666.) As a matter of principle, the financial cost of the election should be entirely irrelevant to the legal issue before us—such costs are incurred whenever a special election is called, yet no exception exists for pre-election review in such cases. (In passing, it perhaps bears noting that the legislative leadership reportedly has vigorously resisted any effort to *reduce* these costs by combining the special election with a general election in November 1983.) As for the election process and deadlines, we have previously and consistently recognized a reasonable flexibility in these matters and, in the exercise of our equitable powers, have waived or extended these deadlines in order to assure the orderly conduct of the election. (E.g., *Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638, 678-679 [180 Cal.Rptr. 297, 639 P.2d 939]; *Legislature* v. *Reinecke* (1973) 10 Cal.3d 396, 406-407 [110 Cal.Rptr. 718, 516 P.2d 6].)

Having expressed my strong objection to the *premature* disposition of this case, I turn to the merits of the controversy and, ultimately, to the majority's principal assertion that reapportionment can occur only once every 10 years. While the political impact of this dispute may well rise to Olympian heights, the legal and constitutional issues, in my view, are very much at ground level.

### 1. *The Constitutional Origin and Nature of the Initiative*

Our state Constitution contains some very fundamental principles relevant to this case. First and foremost, "*All political power is inherent in the people.* Government is instituted for their protection, security, and benefit, *and they have the right to alter or reform it* when the public good may require." (Cal. Const., art. II, § 1, italics added.) A corollary to this is that "The legislative power of this State is vested in the California Legislature . . . , *but the people reserve to themselves* the powers of *initiative* and referendum." (*Id.,* art. IV, § 1, italics added.) Finally, "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." (*Id.,* art. II, § 8, subd. (a).)

Thus, the Constitution forcefully teaches us that the source of ultimate legislative and political power in this state, and *all* of it, is found not in Sacramento or Washington D.C. but in the *people,* who may exercise this power both indirectly (through their chosen representatives) or directly (through a referendum or, as here, an initiative).

What is the nature of the initiative? In 1976, Justice Tobriner described it in glowing terms: "The amendment of the California Constitution in 1911 to provide for the *initiative* and referendum signifies one of the *outstanding* achievements of the progressive movement of the early 1900's. Drafted in light of the theory that *all power of government ultimately resides in the people,* the amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them. Declaring it 'the *duty of the courts to jealously guard* this right of the people' (*Martin* v. *Smith* (1959) 176 Cal.App.2d 115, 117 [1 Cal.Rptr. 307]), the courts have described the initiative and referendum as articulating '*one of the most precious rights of our democratic process*' (*Mervynne* v. *Acker* [1961] 189 Cal.App.2d 558, 563 [11 Cal.Rptr. 340]). '[I]t has long been our judicial policy to *apply a liberal construction* to this power wherever it is challenged in order that the right be not improperly annulled. *If doubts can reasonably be resolved in favor of the use* of this reserve power, courts will preserve it.' (*Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558, 563-564; *Gayle* v. *Hamm, supra,* 25 Cal.App.3d 250, 258.)" (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038], italics added, fns. omitted.) In short, we have traditionally insisted that an initiative is entitled to *very* special and *very* favored treatment.

Since *Associated Home Builders* and until today, we have faithfully followed these admonitions regarding this constitutional right. (See, e.g., *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 241 [186 Cal.Rptr. 30, 651 P.2d 274] [upholding the "Victims' Bill of Rights" initiative]; *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 41 [157 Cal.Rptr. 855, 599 P.2d 46] [upholding, in most respects, the Political Reform Act of 1974]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219-220, 248 [149 Cal.Rptr. 239, 583 P.2d 1281] [upholding the Jarvis-Gann Property Tax initiative].)

2. *The Reapportionment Struggle*

A brief review of the current reapportionment struggle reveals why from a policy standpoint it is so *essential* that the people retain, in its pure form, their constitutional initiative power over reapportionment, even if both a legislative and an initiative plan have been adopted in the same census period.

In 1981, following the 1980 census, the Legislature purported to reapportion the legislative and congressional districts, pursuant to a constitutional grant of such power. (Cal. Const., art. XXI.) After charges that this

plan (Plan I) was greatly and unfairly gerrymandered, referendum petitions challenging Plan I were promptly circulated and the referendum qualified for the June 1982 Primary Election ballot. At this point, responding to litigation challenging the referendum, and despite clear and applicable precedent calling for a stay of the 1981 reapportionment legislation as to legislative districts (*Legislature* v. *Reinecke* (1972) 6 Cal.3d 595 [99 Cal.Rptr. 481, 492 P.2d 385]), a bare majority of this court, while permitting the referendum to proceed, ordered that the new, challenged and subsequently invalidated voting boundaries applied to the 1982 legislative and congressional elections. (*Assembly* v. *Deukmejian, supra,* 30 Cal.3d 638.) Our action thereby assured that, though the legislative plans might change, the authors would not.

At the June 1982 referendum election, the people of California overwhelmingly rejected Plan I. However, because of our ruling, the present Legislature was elected pursuant to the invalid 1981 district boundaries. Those same legislators drafted a new plan (Plan II) and, in January of this year, effectuated it. The challenged initiative before us is intended to replace Plan II.

The Legislature, in adopting Plan II, denominated it an "urgency" measure as to legislative districts. By this device the Legislature effectively prevented the people from once again exercising in 1983 their referendum right to invalidate Plan II. (See Cal. Const., art. II, § 9, subd. (a).)

The full import of today's opinion thus becomes manifest. The Legislature precluded the people from another *referendum* similar to that which last year threw out Plan I. Now the majority of this court not only wrenches from the people their only remaining legal tool, the *initiative* power, but slams the door to the polling place in the face of the people's attempt to exercise their additional power, also constitutionally protected, to "alter or reform" their government when the public good requires it. (*Id.,* art. II, § 1.) Together, marching in lockstep, the Legislature as to the referendum and now this court as to the initiative, have effectively and completely prevented the people from *any* exercise of their popular will. The unfortunate consequence of today's ruling is that on this matter of great public moment, the people are thereby blocked from expressing through their ballots their own wishes as to the boundaries of the districts from which their legislative representatives are elected. This decision no longer can be made by the people. The Legislature and this court have made it for them. This dubious result is reached notwithstanding the following: constitutional mandates that the people have reserved to themselves *all political power,* our repeated assurances that the people's initiative is a "most precious" right, and the

absence of any constitutional prohibition whatever against reapportionment by initiative. As a consequence, the ultimate sovereign, the people, find themselves imprisoned within the walls erected by their own servants, the Legislature and this court.

This is but the latest chapter in a very unhappy period in California political history. Realignment of voting boundaries, congressional and legislative, has become so volatile, so heavily laced with partisan wrangling and self-interest, that the periodic process has become something painfully to be endured. This has been going on for years. Doubtless there must be a better way. However, it is not for a court to fashion one, but rather for the people, groping for some equitable resolution, to choose the appropriate alternative.

In sum, the events of the past few years afford a vivid, precise, and concrete demonstration of the danger of depriving the people of their powers of initiative and referendum. The majority's very unfortunate holding is compelled by neither sound analysis nor precedent.

### 3. *Reapportionment by Initiative*

While counsel for petitioners have readily conceded that a legislative or congressional reapportionment may be accomplished by use of the initiative process, my colleagues may have withdrawn from even that concession and their position remains cloudy and vague. (*Ante,* pp. 673-674, 679.) If, in truth, they really do not accept the right of the people themselves to reapportion by initiative, the distance of the majority's retreat from precedent can be precisely measured. Eighteen years ago Chief Justice Traynor, referring to a people's initiative within the reapportionment context, said for a unanimous court: "The makeup and apportionment of the Legislature involve peculiarly political questions that are not appropriate for this court to decide. They are far better entrusted to the collective political wisdom of the Legislature *subject to the power of initiative and referendum reserved to the people."* (*Silver* v. *Brown* (1965) 63 Cal.2d 270, 280 [46 Cal.Rptr. 308, 405 P.2d 132]; see *Blotter* v. *Farrell* (1954) 42 Cal.2d 804, 811-813 [270 P.2d 481] [local redistricting by initiative]; 18 Ops.Cal.Atty.Gen. 11, 14 (1951) [congressional reapportionment by initiative].)

This court's doubts about the people's reapportionment power through initiative are of very recent origin. Indeed, our sister states have uniformly acknowledged that the people may reapportion by exercising their initiative power. (*Armstrong* v. *Mitten* (1934) 95 Colo. 425 [37 P.2d 757, 759-760] [legislative reapportionment]; *In re Initiative Petition No. 317, etc.* (Okla.

1982) 648 P.2d 1207, 1212-1213 [congressional reapportionment]; *State* v. *Hinkle* (1930) 156 Wash. 289 [286 P. 839, 840-841] [legislative reapportionment].)

As our Constitution itself provides, "The initiative is the power of the electors *to propose statutes* and amendments to the Constitution and to adopt or reject them." (Cal. Const., art. II, § 8, subd. (a), italics added.) The qualified initiative before us, consistent with standard legislative procedure, *proposes statutes* (amendments to the Elections Code) which would reapportion the state's legislative and congressional districts. No "liberal construction" is needed to conclude that the initiative power includes the power to reapportion the state's voting districts, resting as it does on the plain language of the Constitution.

### 4. *Reapportionment Once Every Decade*

Initially, it should be noted that my colleagues obviously err in claiming that, in some way, California has a "constitutionally mandated" rule "that redistricting may occur only once" within the decade. (*Ante,* p. 663.) One can read the California Constitution from beginning to end without finding a trace or hint of an expression mandating any such limitation on the people's initiative power. The majority cites no provision of the Constitution, no article, no section. There is none. The Constitutional provisions vesting *in the people "all political power"* and *"the right to alter or reform"* their government (art. II, § 1, italics added), are entirely inconsistent with the majority's restriction upon initiative reapportionment. Former article IV, section 6, on which the majority relies for an "historical understanding" did not deny the people the right to adopt their own reapportionment. Indeed, the article was adopted more than 30 years before the people placed their initiative right in their Constitution.

Lacking any express inhibition on the people's initiative power, the majority bases its technical argument upon an expanded interpretation of article XXI of the state Constitution, a very shaky platform. That provision directs *the Legislature* "In the year following the year in which the national census is taken . . ." to adjust the voting boundaries. It refers to the *Legislature, not the people.* This article may, as discussed below, limit the power of *the Legislature* to adopt multiple reapportionment plans during a single census period, but it contains no language placing a similar restriction upon *the people's* initiative power. Undaunted, my colleagues reason that because the people in enacting new political boundaries are exercising "legislative" power, and because the Legislature also exercises "legislative" power, therefore the limitation constitutionally imposed upon the Legislature must

restrict the people as well. By interpretation, my colleagues insert the language "or the people through the initiative" after the words "the Legislature" in article XXI. But this judicial redrafting of the article will not do, for the majority misconceives the true constitutional origin of the people's power to reapportion. The right to redistrict the state by initiative derives not from any grant of power originating in article XXI, but rather from the broad reservation to the people of *all* political and legislative power contained in article II, sections 1 and 8, and article IV, section 1, as previously discussed.

It is also interesting to note that although the majority relies on article XXI to uphold Plan II, the plan itself does not comply with the article which requires that the boundaries be adjusted "in the year following" the census. Plan II was enacted in the *third* year following the census. Indeed, in the 1970's the plan formulated by this court was adopted in the *fourth* year after the census.

The cases relied upon by the majority do not suggest such a restriction as my colleagues wish to engraft upon reapportionment by initiative. Two older cases (*Wheeler* v. *Herbert* (1907) 152 Cal. 224, 237 [92 P. 353]; *Dowell* v. *McLees* (1926) 199 Cal. 144, 146 [248 P. 511]) involved statutory changes in county boundary lines, changes which also would have altered the preexisting legislative districts, accomplishing an unintended de facto reapportionment. We held that the *Legislature's* power to form legislative districts may be exercised only once during the period between one national census and the succeeding one. *Wheeler,* of course, could not have contemplated any once-a-decade limitation upon initiatives because it was decided before the initiative existed in California. *Dowell* concerned the *Legislature's* power and, as the majority acknowledges, relied wholly on former article IV, section 6, which is confined exclusively to the Legislature's authority.

A subsequent case (*Yorty* v. *Anderson* (1963) 60 Cal.2d 312, 316-317 [33 Cal.Rptr. 97, 384 P.2d 417]) does not help the majority at all. *Yorty* made it abundantly clear that the "once-every-decade" principle is *not* absolute *even as to the Legislature,* and that the Legislature has the power to adopt a second reapportionment plan within a single census period if the courts, *or the people by referendum* (p. 317), have nullified the initial plan. Thus, even the Legislature is free from the restraints which the majority without constitutional authority has now imposed upon the people themselves.

At this point, I put these simple but relevant questions to my esteemed colleagues: If the people can, as here, *indirectly* through referendum, man-

date the Legislature to adopt a *second* reapportionment plan within the same decennial census period, why may not the same people, *directly* through the initiative achieve the same result? How is it that the public's servants, the Legislature, may place a reapportionment plan beyond the reach of their masters, the people? Put another way, in constitutional analysis how is it that the servants of the people are elevated above the *sovereign* people who are vested with "*all* political power"? If the people wanted to impose upon themselves a once-a-decade limitation, why have they not expressly done so, having had ample opportunity as recently as 1980 when article XXI was substituted for former article IV, section 6? Why, contrary to the rules which direct us to interpret the initiative favorably, do my colleagues (1) read into a constitutional section language which the people omitted, and (2) decline to resolve any reasonable doubts in support of the initiative?

As we stated in *Fair Political Practices Com.* v. *Superior Court, supra,* 25 Cal.3d 33, at p. 42, "The people having reserved the legislative power to themselves as well as having granted it to the Legislature, there is no reason to hold that the people's power is more limited than that of the Legislature . . . ." Surely, if contrary to article II, section 1, the constitutional power of the people is not paramount, it cannot be *less* than that of their own creation, the Legislature.

The Legislature, acting pursuant to article XXI, may reapportion the state once every 10 years. The people, acting pursuant to article II, section 1, may *reject* the Legislature's effort as they may other legislative acts or indeed rulings of this court through referendum (*Yorty, supra,* 60 Cal.2d 312, 316-317) and may *replace* that effort with the people's own plan. The Legislature's role in reapportionment cannot rise to a higher level than that of its source, the people, nor can it, a creation of the people, constitutionally preempt the people. This is a fundamental, constitutional principle with which my colleagues do not choose to grapple.

The Oklahoma Supreme Court last year in *In re Initiative Petition No. 317, etc., supra,* 648 P.2d at page 1212, applied supportive analysis in squarely upholding the people's exercise of their initiative power to adopt a reapportionment plan despite the Oklahoma Legislature's prior adoption of a plan within the same decennial census period. In Oklahoma, as in California, the "Constitution in no way restricts the initiative against a legislative congressional enactment." (*Ibid.*) Moreover, in Oklahoma, as in California, "There is no express prohibition contained in the constitutional [reapportionment] provision, nor in the statute, which would prohibit a second valid congressional redistricting within the ten-year period following a

decennial census." (*Ibid.*; see *Exon* v. *Tiemann* (D.C.Neb. 1967) 279 F.Supp. 603, 608.)

The Oklahoma Supreme Court concluded that "We hold that the electorate of Oklahoma are entitled to invoke the initiative against a legislative congressional redistricting act even though the initiative and the legislative enactment occur during the same ten (10) year period and are based upon the same federal census." (648 P.2d at p. 1213.) The people of California retain no lesser political authority than the people of Oklahoma. (See also *Lucas* v. *Colorado Gen. Assembly* (1964) 377 U.S. 713, 732 [12 L.Ed.2d 632, 84 S.Ct. 1459] [in Colorado, "the initiative device provides a practicable political remedy to obtain relief against alleged legislative malapportionment . . ."].)

As noted, petitioners herein concede that, following the people's invalidation of Plan I, if a qualified reapportionment initiative had been approved by the people it might have been valid. But, petitioners reason (with the apparent concurrence of the majority) that the Legislature beat the people to it. The lawmakers acted first and thereby instantly and for the balance of the decade preempted for themselves the whole reapportionment power. This rationale contemplates that the people and the Legislature engage in a foot race to the reapportionment drawing board to draft the first plan after the invalidation by a successful referendum within a current decennial census period. Given the procedural and financial hurdles inevitably placed in the path of all initiative proponents in the circulation, qualification and election process, can there be any reasonable doubt that the Legislature will win the race? When the people have been denied their right to vote, they will gain small comfort from being told, in effect, "come back again in 10 years and maybe we'll talk about it," for in 1990 the same unending cycle will be repeated, continuing in perpetuity. What kind of a responsive democracy is that? Such an implied surrender of their political power cannot have been within the reasonable contemplation of the voters when they adopted the Constitution or its initiative or reapportionment provisions.

Warning against a "premature interposition of the judiciary" in cases of this kind, one appellate court made these cogent observations: "We take judicial notice of the fact that a large cross-section of the citizenry entertains an opinion that the government is no longer representative of the people. It takes outlandish financial resources to mount a campaign for office, lobbyists play no small part in controlling the destiny of legislative measures, and in election years our elected representatives procrastinate taking action even on urgent matters. *One counter-balance to this trend is to give vitality to*

*the initiative power."* (*Gayle* v. *Hamm, supra,* 25 Cal.App.3d 250, 257-258, italics added.)

Regrettably, my colleagues vote today for less democracy in California. This is doubly sad for it occurs at a time when there is a growing feeling of detachment and separation of the citizen-voters from the handles, controls and direction of their affairs. The people's representatives often seem quite distant from the voter separated by a large, faceless bureaucracy. There are numerous signs these days of voter apathy and the decline in voter partici-pation and interest in public policy matters. The surest way to promote this decline is to cut off the opportunities for citizen participation. The most effective way to increase public interest in political issues is to assure that the people have the widest practical opportunity to share in making the public decisions which directly affect them. In the New England town meet-ing the people's voice was heard in its purest form. The use of this method is not feasible in a large state with 23 million people. It is all the more important to preserve for our citizens those few remaining alternatives by which the people's voice may be heard and their will expressed and imple-mented. This, to my mind, is the very essence of democracy.

The majority insists that invalidation of the initiative is required in order to insure "repose—which promotes stability in districts and minimizes po-litical battles . . . ." (*Ante,* p. 675.) Tranquility has its place, but, with re-spect, I suggest that, purchased at the cost of the people's power to decide the boundaries of their own legislative districts, the price is far too high. The greater danger of "instability" lies in muffling the people's voice.

In my view, the initiative process and the ballot constitute the people's only weapons to dislodge entrenched political dynasties created and sus-tained primarily by virtue of their own use and misuse of the reapportion-ment device. Using the referendum in 1982, the people spoke to the Leg-islature very loudly in rejecting Plan I. In 1983 the people might have shouted if they had been given the opportunity to vote on Plan II. In a democratic society so heavily dependent upon a system of interlocking gov-ernmental checks and balances, surely we cannot sacrifice the salutary pro-tection of the initiative.

If the people are denied any right to approve or disapprove a blatantly gerrymandered reapportionment plan, then there is absolutely no check on the Legislature's abuse of power. The concept of a Legislature perpetuating its tenure by devising a reapportionment plan wholly immune from review or revision by the people themselves is dangerous and repugnant to consti-tutional principles.

Several years ago, one observer of the California political scene made these pertinent observations regarding the initiative and referendum: "As the periodic assaults on the initiative and referendum arise and fade, it is hoped that the courts will resist urgings to use judicial powers to circumscribe these institutions. While the initiative and referendum may not fit into a given philosopher's democratic model, and while these powers may, like any others, be misused from time to time, one would hope the courts will not fall prey to the elitist argument that the people do not know what is best for them and therefore need someone else to tell them. Pragmatically, the institutions work; like their representatives, the people may sometimes approve mischievous or unconstitutional measures, but by and large, as studies show, they are good legislators. In a society where government moves further and further from the people, these institutions can help keep it near. If an occasional 'bad' measure is passed, let those who urge less democracy instead use the tools of democracy to convince the people of the 'rightness' of their view. While the courts have the duty to maintain these institutions within their proper boundaries, they should not be the vehicle for any constriction of those boundaries." (Greenberg, *The Scope of the Initiative and Referendum in California* (1966) 54 Cal.L.Rev. 1717, 1747-1748, fn. omitted.)

The people can make mistakes, so can legislatures, and so can courts, but mistakes can be corrected. History has demonstrated repeatedly that in the long run, the people's judgment is ultimately to be trusted. If not, then whose? I do not know whether the particular initiative measure before us is good, bad or indifferent, or whether the people would have voted it up or down if permitted to do so. What I do know is that the reapportionment initiative, signed by over half a million voters, has legally qualified for the ballot. The initiative involves a matter of compelling public interest. I see no legal or constitutional impediment to a public vote. The people should be heard on this issue.

I would deny the peremptory writ.

APPENDIX A
July 20, 1983
ELECTION CALENDAR
JUNE 1984
PRIMARY ELECTION

The following is a list of the earliest statutory deadlines for which compliance requires a knowledge of district boundaries:

a. December 30, 1983, (E-158): First day for candidates to obtain, clerks to issue, and voters to sign petitions in lieu of filing fees. Elections Code sections 6494.1; 6555. Petition signers must be registered in the district from which the candidate seeks nomination in the primary election. Elections Code section 6555(b)(1). Candidates must reside in the district in which they seek election. Cal. Const. Art. IV, sec. 2(a); Elections Code section 75. County clerks and registrars must mark the petition at the time of issuance with the name and district number of the office sought. Elections Code section 6551.

Peace and Freedom, American Independent, and Libertarian Party candidates calculate the number of signatures necessary for their petitions in lieu of filing fees based on a percentage of the total number of voters registered in the district from which they seek nomination. Elections Code section 6555(a)(6).

b. January 3, 1984, (E-154): As of this date, county clerks must prepare indexes of registered voters and reports of registration by political subdivision. This information must be compiled and made available to the Secretary of State and to candidates by January 23, 1984, (E-135). Elections Code sections 607(g), 608-611, 6460(a).

Candidates use the indexes in directing their campaigns towards voters residing in the district.

c. January 31, 1984, (Fixed by Law): Deadline for county clerk to compute the number of members of American Independent Party County Central Committee allotted to each Assembly district or supervisorial district, as the case may be. Elections Code section 9721. See Elections Code sections 9700, 9701.

d. January 31, 1984, (E-127): First day on which county clerks and registrars of voters must issue and candidates for state legislative office may file declarations of intention. Elections Code section 25500(a). The declarations state the office sought.

e. February 1, 1984, (E-125): Deadline for the Secretary of State to compute for each county the number of members of Party Central Committees for the Peace and Freedom and Libertarian parties, and transmit that number to the county clerks and party officials. Elections Code section 9770. The number of members in each county depends on the number of Assembly districts located in the county. See Elections Code sections 9700, 9701.

f. February 8, 1984, (E-118): Last day to file Declarations of Intention for legislative office. Elections Code section 25500.

g. February 13, 1984, Adjusted from Saturday, (E-115): Deadline for county clerks to compute the number of Libertarian and Peace and Freedom Party Central Committee members to be elected in each supervisorial or Assembly district. Elections Code section 9771.

h. February 13, 1984, (E-113): End of extension period for persons other than the incumbent to file declaration of intention. Elections Code section 25500.

i. February 13, 1984, (E-113): Deadline for county clerks to forward declarations of intention for legislative candidates to the Secretary of State. Elections Code section 25500.

j. February 13, 1984, (E-113): First day for county clerks to issue, candidates to obtain, and voters to sign nomination papers and declarations of candidacy. Elections Code section 6490.

k. February 21, 1984, (E-105): Deadline for Secretary of State to compile a statewide report of registration, broken out by legislative districts, among other divisions. Elections Code section 6460.

l. February 22, 1984, (E-104): Deadline for Secretary of State to prepare and transmit

to the county clerks and registrars of voters a notice designating all state offices for which candidates are to be nominated in the Primary Election. Elections Code section 6462.

m. February 23, 1984, (E-103): Deadline for candidates to file petitions in lieu of filing fees. Elections Code sections 6494.1, 6555(b)(3).

n. March 5, through 12, 1984, (Fixed by Law): Period in which county clerks are required to compute the number of members of each Democratic and Republican Central Committee allotted to each Assembly district or supervisorial district, as the case may be. Elections Code sections 8871, 9371. See Elections Code sections 8820-8823, 9320-9323.

o. March 7, 1984, (E-90): Deadline for county central committees to nominate persons for appointment as precinct board members. Nominees must be registered voters residing in the precinct for which they are nominated. Elections Code sections 75, 1639. State legislative and congressional boundary lines must be known before this date in order to observe this deadline, because precinct lines are based on those district boundary lines. See Elections Code section 1513.

p. March 9, 1984, (E-88): Deadline for circulation and filing of candidates nomination papers, and supplemental petitions in lieu of filing fees. Elections Code sections 6490, 6555(b)(3).

q. March 14, 1984, (E-83): Deadline for candidates to file nomination papers for state Senate and Assembly, in cases where incumbent state legislator files a declaration of intention but fails to qualify for the nomination by March 9. Elections Code section 25500(b).

r. March 14, 1984, (E-83): Last day on which it will be known if candidates will be authorized to file nomination papers up through March 23, 1984, (E-74). This applies only in cases where only one candidate files nomination papers for a partisan nomination and the candidate dies on or before March 14, 1984. Elections Code section 6490.2.

s. March 14, 1984, (E-83): Last day on which county clerks and registrars of voters may certify and file nomination documents for state office with the Secretary of State. Elections Code section 6507.

t. March 15, 1984, (E-82): The Secretary of State shall conduct a drawing of the letters of the alphabet, for the purpose of determining the order in which candidates appear on the Primary Election ballot. Elections Code section 10217. The statute generally contemplates that the order of candidates be known after the last day on which voters may qualify to become candidates.

u. March 23, 1984, (E-74): See entry "r" for March 14, 1984.

v. March 26, 1984, Adjusted from Saturday, (E-73): Deadline for county clerks and registrars of voters to determine whether the number of American Independent, Democratic and Republican County Central Committee candidates who have filed for each Assembly or supervisorial district exceeds the number to be elected. If not the clerk shall not include the office or the candidates on the ballot, unless a petition signed by 25 registered voters indicating that a write-in campaign will be conducted for the office has been filed no later than March 29, 1984, (E-68). Elections Code sections 8873, 9373, 9723.

w. March 26, 1984, Adjusted from Saturday, (E-73): Deadline for the Secretary of State to notify each candidate for partisan office, including candidates for state Legislature and for congress, of names, addresses, offices, occupations and party affiliations of all other persons who have filed for the same office. Elections Code section 6580.5.

x. March 29, 1984, (E-68): Deadline for Secretary of State to prepare and transmit to county clerks and registrars of voters a certified list identifying candidates entitled to receive votes at the Primary Election. Elections Code sections 6580-6584.

y. April 2, 1984, (Approximately E-64): Clerk to publish the certified list of candidates together with office sought. Elections Code sections 6585-6588.

z. April 12, 1984, (E-54): If on this date, there are 100 or fewer persons registered to vote in any precinct, the clerk may mail each voter an absentee ballot along with a statement that there will be no polling place for the election. Ballots shall be sent as

soon as they are available. Elections Code section 1005.

aa. April 16, 1984, (E-50): Deadline for clerk to publish notice of the primary election, including list of offices to be filled. Elections Code section 2554.

bb. April 26, 1984, (E-40): First day clerk to commence mailing polling place notice and appropriate party or nonpartisan sample ballot to each registered voter. Elections Code section 10007.

cc. May 7, 1984, (Adjustment for Sunday), (E-30): Last day precincts may be created, united, divided, or combined where voting machines are used. Elections Code section 1509.

dd. May 7, 1984, (E-29): Last day to appoint precinct board members and designate polling places. Elections Code section 1638.

ee. May 7, 1984, (E-29): First day that absentee voters may cast ballots. Elections Code section 1002.

ff. May 11, 1984, (E-25): Last day for clerk to prepare separate sample ballots for each political party and a separate non-partisan sample ballot. Elections Code section 10007.

gg. May 22, 1984, (E-14): Last day for write in candidates to file declaration of write in candidacy, and nomination papers, if any. Elections Code section 7301.

hh. May 22, 1984, (E-14): Last day for clerk to prepare a list of precincts to which bilingual precinct officials were appointed. Elections Code section 1635.

ii. May 29, 1984, Adjustment for Saturday, (E-10): Last day for clerk to transmit to the Secretary of State a statement, as of May 7, showing the county registration by party and district. Elections Code section 6460.

jj. May 29, 1984, (E-7): Last day for submitting standard absentee voting applications. Elections Code section 1002.

kk. May 31, 1984, (E-5): Last day for clerk to complete mailing of sample ballots for all voters. Elections Code section 10007.

ll. June 5, 1984, Election Day. Elections Code section 2521.